THE UNITED STATES, APPELLANTS v. DON FERNANDO DE LA MAZA ARREDONDO AND OTHERS, APPELLEES.

The grant of the king of Spain to F. M. Arredondo and son, for land at Alachua in Florida, gave a valid title to these claimants under the grant, according to the stipulations of the treaty between the United States and Spain of 1819, the laws of nations, of the United States, and of Spain.

Construction of the treaty with Spain of 1819, relative to grants of lands in the territory of Florida; and of the several acts of congress, passed for the adjustment of private claims to land within that territory.

THIS was an appeal from the superior court of the eastern district of Florida.

On the 11th day of November 1828, Fernando de la Maza Arredondo and son, and others, their grantees, filed their petition in the superior court of the eastern district of Florida, against the United States, under the provision of the sixth section of an act of congress passed May 23, 1828, entitled "an act supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida."

The petition stated, that the petitioners claimed title to an undivided parcel of land, containing two hundred and eighty-nine thousand six hundred and forty-five acres, situated in the county of Alachua, in the eastern district of Florida, about thirty-six miles west of the river St Johns, and about fifty-two miles west of the city of St Augustine; which land extends four leagues to the east point of the compass in a rectilinear figure, taking as the centre thereof a place called Alachua, formerly inhabited by a tribe of Seminole Indians, but subsequently abandoned by them: that the said tract of land was granted by the Spanish government, with all the formalities and solemnities used by it in such cases, to the petitioners, on the 22d day of December 1817, the said grant having been executed at Havana, in the island of Cuba, by Don Alexander Ramirez, intendant of the army, superintendent general, and subdelegate of the royal exchequer of the island of Cuba, and the two Floridas, &c. &c. by and with the advice and approbation of the surveyor general of the two Floridas, and of the minister fiscal, the king of Spain's attorney general. A trans-

lation of the grant and other proceedings was annexed to the petition as follows:

Don Alexander Ramirèz, intendant of the army, and sub-delegate superintendent general of the royal domain of the island of Cuba and the two Floridas, president of the tribunal of accounts and of the board of tithes, superintendent of the department of the crusades, judge particular of vessels putting in port by stress of weather, and protector of the royal lottery, superior chief and inspector of the royal factory of segars, &c.

Whereas Don Fernando de la Maza Arredondo and Son, merchants of this city, have presented a memorial to this intendancy general and subdelegate, of the 12th of November last, in which they pretend to obtain, as a gratuitous grant, a lot of land in East Florida, where they have been established, and where still remains the greater part of their family, and a great deal of their property, offering to form an establishment in the territory known under the name of Alachua, as it is adapted to the growing of cattle and the culture of provisions; said establishment to be composed of two hundred families, which they are to convey at their own costs, proposing other advantages which will result, not only in favour of the other inhabitants already established, and residents of the city of St Augustine, but also in favour of the Creek and Seminole Indians living on the borders of that country, provided they obtain in absolute property the said grant limited to four leagues of land to every point of the compass, fixing as the central point thereof the indicated tract of Alachua. And the said memorial having passed by my decree of the 12th instant, to the captain of infantry, Don Vincente Sebastian Pintado, surveyor general of the two Floridas, for his information, which he gave on the 15th of the same month, with all the necessary information and solid reasons which de monstrate and make known the convenience and utility of providing for the increase of population in said province, without expense to the royal treasury, and of accepting the offers of the interested parties, on account of the importance of the undertaking, and of the considerable disbursements which they will have to make to carry the same into effect. In consequence thereof, by a decree of the same day, the subject was communicated to

the auditor fiscal of the royal domain, who, in his representations of the 17th, founded on the sovereign disposition concerning the increase of population in those possessions of his majesty, supported the pretensions of Maza Arredondo and Son, gave his consent in order that the land which they solicit be granted to them in the terms they propose.    Wherefore, on the day of yesterday, I provided the act which follows: Seen.    In virtue of the royal order of the 3d of September, in this year, by which, in appointing me superintendent of the two Floridas, his majesty commands me, in express terms, to provide for the increase of population in those provinces by every means which my prudence and zeal may dictate, with the concurrence of his lordship the fiscal, and with the report of the surveyor general of the said province, the tract called Alachua, in East Florida, is declared to belong to the royal domain.    In consequence whereof, and in attention of the notorious integrity and fidelity, to the known capital and other good qualities of Don Fernando de la Maza Arredondo and Son, I grant to them the part which they solicit of the said tract belonging to the royal domain, in conformity to the sovereign dispositions on this matter, and with the precise condition to which they obligate themselves to establish thereon two hundred families, which ought to be Spanish, with all the requisites which are provided for, and others which will be provided by this superintendency, in virtue of the said royal order; the said establishment to begin to be carried into effect in the term of three years, at farthest, without which this grant will be null and void; said grant is also understood to be made without prejudice to a third party, and especially to the Indians, natives of that land, who may have returned, or may pretend to return, to make there their plantations.    Let this expedient pass to the surveyor general above mentioned, in order that he may make the corresponding plot, in conformity to his information, and the granted extent of four leagues to every wind in a rectilineal figure, with all possible perspicuity, to avoid future doubts and litigations; which being done, let the title in form be executed, with the same plot annexed thereto, a copy of which will remain in the expedient, with the provision that the said three years allowed to commence the establishment of families are to run and be counted from

this date; and that, on the first families being prepared and disposed, the grantees will give notice of it, together with a list of the individuals, and mention made of the places of which they are natives, of their occupation, in order that the orders and instructions which the government and the superintendency of the royal domain in East Florida may see fit to give, be issued, and in order that an account of the whole be given in proper time to his majesty.

The figurative plan formed by the surveyor general aforesaid being presented, with the explanation which, in continuation, he gave of the survey and demarcation, it results that the tract of land is situated in East Florida, fifty-two miles, more or less, distant west from the city of St Augustine, and about thirty-six miles west of the western margin of the river St John's; bounded on every side by vacant lands, the place known by the name of Alachua being towards the centre, which place was formerly inhabited by a tribe of the Seminole nation, which abandoned it; and according to the dimensions and form which were given to the tract in said plot, and the report annexed to it, it is specified that, as the leagues used in that province are equal to three English miles, containing each one thousand seven hundred and sixty yards or eighty chains of Gunter, the space granted contains two hundred and eighty-nine thousand six hundred and forty-five English acres, and five-sevenths of an acre, equal to three hundred and forty-two thousand two hundred and fifty *arpents,* and one-seventh of an *arpent,* a measure used in West Florida, and counting for an English acre one hundred and sixty perches and sixteen and a half feet, London measure, to a lineal perch as used in the time of the British dominion, and tolerated since by our government. Wherefore, in the exercise of the faculties which have been conferred upon me by the king our lord, whom may God preserve, and in his royal name, I do grant, gratuitously, to the said Don Fernando de la Maza Arredondo and Son, the number of acres of land as above stated, under the limits, courses, and distances, pointed out in the figurative plot, a copy of which will be annexed to this title, in order that they may possess the same as their own property, and enjoy it as the exclusive owners thereof, and in the terms exposed in my decree inserted in it.

In testimony whereof, I have ordered the execution of this title, signed before me, and sealed with the royal seal used in my office, and countersigned by the commissary of war, Don Pedro Carambot, his majesty's secretary of this intendancy and of the subdelegate superintendency general.   Given in the Havana, on the 22d of December 1817.

[L. S.]                    ALEXANDRO RAMIREZ.

PETER CARAMBOT.

An account of the preceding title has been taken and registered in the book prepared for that purpose in the secretary's office under my charge.   Havana, date as above.

CARÀMBOT.

This grant was alleged to have been authorised by a royal order of the king of Spain, and other proceedings, of which the following translation was annexed to the petition.

Don Juan Nepomuceno de Arrocha, honorary comptroller of the army, and secretary of the intendancy of the public finance of this island, and that of Puerto Rico.

I do hereby certify, that, in compliance with the decree of the 7th of this month, of the superintendent Don Francisco Javier Ambari, made at the petition of Don Fernando de la Maza Arredondo, of the 4th instant, and filed in the secretary's office under my charge, exists the royal order of the following tenor.

His majesty, understanding by the letters of your lordship of the 14th and 18th of August, and 21st of October, of the year last past, No. 18, 28, and 107, of the resolution concluded with the captain general of that island, to regulate all that appertains to the branch of the royal finance, and to attend to the protection and advancement of the two Floridas; and having conformed himself with the advice given by the supreme council of the Indies, in their deliberations held on the 11th of August last, his majesty has been pleased to approve, for the present, all which has been done with respect to the regulations of said branch, as also the supplies administered by the board of royal finance for the payment of the regiment of Louisiana, and other indispensable expenditures for the fortifications and defence of the cities of St Augustine and Pensacola, authorising your lordship, in case of necessity, to aid or sup-

ply them. His majesty, likewise, has determined, for the present, the superintendency of the two Floridas in favour of your lordship, as superintendent of the island of Cuba: and, lastly, his majesty has been pleased to command to inform your lordship, as I now do, that you facilitate the increase of the population of those provinces, by all means which your prudence and zeal can dictate, informing, as soon as possible, the motives for the absence of Don Juan Miguel de Losadas and Don Manuel Gonzalez Almirez, from their offices.

All which I communicate to your lordship by royal order, and for your intelligence and compliance thereof. God preserve your lordship many years.

GARAY.

*Madrid, 3d September* 1817.
To the Intendant of Havana.
*Havana, 10th October* 1823.

JUAN NEPOMUCENO DE ARROCHA.

From Senor Don Jose Fuertes, intendant pro tem., advising his having delivered the command to Senor Don Alex'o Ramirez, chosen by his majesty.

*Habano, 3d July* 1816.

The king, our master, having been pleased to confer on Senor Don Alexander Ramirez, by a royal commission of the 5th of October of the year last past, the posts of intendant of the army, superintendent general subdelegate of the royal domain, which I have provisionally exercised by royal order, he has this day taken possession of them, and I advise your excellency of it for your information, and due effects to the service of his majesty. May God preserve your excellency many years.       JOSE DE FUERTES.

His excellency subdelegate of the royal domain.

*St Augustine, Florida.*

The petition proceeded to state: that as an inducement to the Spanish government to make the said grant to F. M. Arredondo and Son, they had offered and stipulated to establish on the same two hundred families, in the event of the said land being granted to them in full dominion and absolute property; which offer was accepted by the Spanish government, it requiring that the families should be Spanish. The grant

[United States v. Arredondo and others.]

was made in absolute property, subject only to the condition that the grantees should begin their establishment in three years from the date of the grant.   That though the settlement of the lands was begun in the months of September or November 1820, yet F. M. Arredondo, who was at Havana, ignorant of the fact, and knowing that previous to that time the settlement had been prevented by the disturbed state of East Florida, obtained from Don Ramirez a prolongation of the time of settlement for one year, by a decree dated 2d December 1820. The petition avers a performance of the conditions of the grant, and that certain Spanish families and subjects were settled on the lands before and after the prolongation of the time for the same, and of the time allowed by the eighth article of the treaty between Spain and the United States, of the 22d February 1819, and that the settlements continue, there being on the lands a number of Spanish families and citizens of the United States, cultivating and improving the same.

The petition avers that from the situation of that part of Florida in which the lands are situated, from the beginning of 1818 until July 1821, they were entitled to that part of the provision of the eighth article of the treaty, which grants and secures to the owners of lands in the territories an extension of time for the performance of grants.   During a considerable period of time after the grant, the war between the United States and the Indians prevented the full accomplishment of the purposes of the petitioners for the settlement of the land; and the danger from the Indians, which would attend any settlement of land at Alachua, continued until the government of the United States took efficient means to protect the country, by posting troops in the same.  The petitioners claimed, that by this state of things, and from these causes, they were exempt from the full performance of the condition of the grant, as to the settlement of the land.

The petition proceeds to state, that the cession of East Florida to the United States has rendered it wholly impracticable for the grantees to introduce and settle two hundred Spanish families on the land, the emigration of the same being prohibited by the laws of Spain.  And the petitioners insist: that the original grantees have thus been prevented performing the conditions of the grant; that the original grantees

VOL. VI.—4 N

and their assigns are thereby discharged of all obligation to
settle families on the lands included in the grant: and that the
United States have failed to ratify the grant, as they were bound
to do under the treaty with Spain, in consequence of which the
grantees could not proceed safely to settle and improve the
land.

The petition alleges that the claims of the petitioners have
been submitted to the examination of the board of commiss-
ioners, under the act of congress of 3d March 1828, entitled
" an act amending and supplementary to the act for ascertain-
ing claims and titles to lands in the territory of Florida, and
to provide for the survey and disposal of the public lands in
Florida:" and the proceedings of the board of commissioners
on the same, are annexed to the petition—that the lands claimed
by the petition are within the territory of Florida ceded to the
United States by the treaty with Spain, of 22d February 1819;
that these claims have not been decided and finally settled
under the provisions of the act of congress of 23d May 1828,
entitled " an act supplementary to the several acts providing
for the settlement and confirmation of private land claims in
Florida;" that the respective claims of the petitioners contain
a greater quantity of land than the commissioners were by the
acts of congress authorised to confirm; and that the said claims
of the petitioners for the said lands, have not been reported
by the commissioners appointed under any of the aforesaid
acts, or any other, or by the register and receiver, acting as
such, under the several acts of the congress of the United
States in that case made and provided, as antedated or forged.

The petition prays that the title of the petitioners to the
land claimed by them may be inquired into by the court,
according to the provisions of the act of congress, &c.

To this petition an answer and supplemental answer were
filed by the attorney of the United States for the district of
East Florida, at May term 1829, and subsequently.

The answer requires that the petitioners shall make due
proof that the tract of land claimed by the petitioners was
granted by the Spanish government to Fernando de la Maza
Arredondo and Son, with all the formalities and solemnities
used in such cases; and that the petitioners held by regular and
legal conveyances under the said grant; and that the court

would require of the said petitioners due proof, according to law and the usages of courts of equity, of the making and execution of the said grant, deeds and conveyances, and of the matters and things therein contained, and in the said bill thereof alleged and set forth.

The answer avers that if the grant was executed, as alleged in the petition, that then Don Alexander Ramirez the intendant, &c. exceeded the powers conferred on him by the crown of Spain; and that no power had been conferred upon the intendant to make grants of land in Florida of the magnitude and description of the one claimed and described in the petition; and if such grant was made by the intendant, it was made contrary to, and in violation of, the laws, ordinances, and royal regulations of the government of Spain, providing for the granting of land in its provinces, and was never approved by the king of Spain; without whose approval it was wholly null and void. And that if it was so made by the Spanish government to the said Fernando de la Maza Arredondo and Son, at the time and in manner and form as the petitioners have alleged, it was made upon the precise obligation, and express condition of their binding themselves to establish there, to wit, on the said tract of land, two hundred Spanish families, with all the requisites which were pointed out to them, and the others which were to be pointed out to them, by the superintendency, &c. to wit, on their beginning their establishment on the said tract of land within three years, at most, from the date of said grant, without which the said grant was to be considered null and void: which condition the said Fernando de la Maza Arredondo and Son accepted, and engaged to perform. That the said Fernando de la Maza Arredondo and Son did not commence their said establishment on the said tract of land within the said three years; and they have not established on the land two hundred Spanish families, according to their engagement, but have wholly failed so to do: and farther, that the said condition and obligation have not been complied with and fulfilled, either by the said Fernando de la Maza Arredondo and Son, or by any other person or persons in their behalf, nor by the said petitioners; so far from it, that the said Fernando de la Maza Arredondo and Son, after the time when the said grant is supposed to have been

made as aforesaid, and without having in any manner complied with the condition thereof, removed their family from the province of East Florida to the island of Cuba, then and still one of the dependencies of the crown of Spain; to wit, after the cession and transfer of the said province to the said United States, and did then totally abandon the said tract of land. And that if the said grant was made as is alleged, and upon the condition mentioned, the performance of the said condition was a matter of special trust and confidence reposed by the said Spanish government in the said Fernando de la Maza Arredondo and Son, which could not have been delegated by them to any other person or persons; and that the sale and conveyance of said tract of land, or of parts thereof, to the said petitioners, by the said Fernando de la Maza Arredondo and Son, in manner and form as is in said bill alleged, without having first performed the said condition, was a violation of the special trust and confidence so reposed in them as aforesaid, and rendered the said grant (if any such was ever made), by the laws then in force in East Florida, entirely null and void.

The answer denies that Fernando de la Maza Arredondo and Son were prevented from a compliance with and performance of the condition of the supposed grant, by any such causes, as are in the bill of complaint, by the said petitioners, alleged and set forth, or that such difficulties at any time existed in relation to the making of the settlement as is charged in the petition; and avers that it would have been perfectly practicable, with due and reasonable exertion, to have proceeded with the establishment and location of the two hundred families on the said tract of land, at any time after the period when the grant is alleged to have been made; and that no circumstances have at any time since that period existed, which could have entitled Fernando de la Maza Arredondo and Son, or the petitioners, to the benefit of the eighth article of the treaty in the bill of complaint mentioned; and that, if any of the parties ever were thus entitled, they each and all of them wholly failed to comply with said condition during the extension of time given by said treaty; and, farther, that, if any such grant of further time was given by the intendant, &c. to the said Fernando de la Maza Arredondo and Son, for the performance

of the said obligation, as is mentioned in the said petition, such grant was rendered null and void by the latter clause of the said eighth article of the aforementioned treaty: and that if it had not been thus rendered null and void, the said Fernando de la Maza Arredondo and Son, and all persons claiming any interest in the said land through them, entirely failed to avail themselves of the benefit intended to have been conferred thereby. The answer denies that the said petitioners are, by the circumstances by them thereunto alleged, stated, and set forth, or by any other circumstances whatever, absolved from the performance and fulfilment of the said condition and obligation; or that they, or either of them, are entitled to hold the said tract of land, or any part thereof, discharged from the said condition or obligation: and farther avers, that, if the said grant was made to Fernando de la Maza Arredondo and Son in manner and form as is stated in the petition (which is not admitted), it was expressly made, and understood to be, without *prejudice* to a *third person*, and especially without prejudice to the native Indians of that soil, who might then have returned, or who might wish to return, to establish themselves there again; and, that after the time when the grant is alleged to have been made as aforesaid, such of the native Indians of that soil as were then absent, or some of them, did return, and, together with others of them, who were already there, wished to and did establish themselves upon the said tract of land.

And the answer avers that the right and title to the said tract of land was, previous to, and at the time when the grant is alleged by the petitioners to have been made, vested in the Florida tribes of Indians, who, previously had, and then did claim title thereto, and occupy the same in their customary manner, as their circumstances required; and that the native Indians formed a part of the Florida tribes: and, farther, that the claim, title, and occupancy of the aforesaid Indians, constituted the only real obstacle (if any existed) to the location and settlement of the two hundred Spanish families on the said tract of land; and that the claim, title, and occupancy of the Indians was a matter of public notoriety, and could not have been unknown to Fernando de la Maza Arredondo and Son, at the time when the grant is alleged to

have been made as aforesaid.   And the answer farther says, that the said claim and title of the said Indians to the said tract of land was not extinguished until the 18th day of September in the year of our Lord 1823.

The answer submits that by the laws, ordinances, and royal regulations of the government of Spain, which were in force in the province of East Florida at the time when the said grant is alleged to have been made, it was provided that the distribution of lands should be made with equity, and without any distinction or preference of persons, or injury to the Indians; and that it was therein and thereby especially provided and commanded, that the lands which might be granted to *Spanish* subjects should be without prejudice to the Indians, and that those granted to the injury of the Indians should be restored to their rightful owners.

The answer further avers, that Fernando de la Maza Arredondo and son were, at the time when the grant is alleged to have been made as aforesaid, and still are, *Spaniards*, and subjects of the government of Spain, and that the grant of the tract of land (if any such was ever made, as is in said petition stated) to Fernando de la Maza Arredondo and son was made to the prejudice and injury of the Florida tribes of Indians.

The answer proceeds to state that the United States claim title to the said tract of land by virtue of the second article of the treaty "of amity, settlement and limits, between the United States and his catholic majesty, which was made, concluded and signed, between their plenipotentiaries, at the city of Washington, on the twenty-second day of February, in the year of our Lord one thousand eight hundred and nineteen, and which was accepted, ratified and confirmed by the president of the same United States, by and with the advice and consent of the senate thereof, on the twenty-second day of February in the year of our Lord one thousand eight hundred and twenty-one, by which his catholic majesty ceded to the said United States, in full property and sovereignty, all the territories which then belonged to him, situated to the eastward of the Mississippi, known by the name of East and West Florida, in which East Florida the said tract of land is situate; and, also, by virtue of the treaty first above mentioned, which was accepted, ratified and confirmed by the president aforesaid, by and with the

advice and consent of the senate aforesaid, on the second day of January, in the year of our Lord one thousand eight hundred and twenty-four.

The supplemental answer avers that if any such grant of further time was given by Don Alexander Ramirez, intendant, &c., as aforesaid, to Fernando de la Maza Arredondo and son, to perform the conditions of the said supposed grant, the grant of further time was equivalent to a new grant for the said lands, and that it was made contrary to, and in violation of, the laws, ordinances and royal regulations, and without any power or authority on the part of the said Don Alexander Ramirez, intendant, &c., as aforesaid, to make it; and that, if the said Don Alexander Ramirez, intendant, &c., as aforesaid, had been invested by the said Spanish government with competent power and authority to make grants of land in Florida of the magnitude and description of the one claimed and described by the petitioners aforesaid, in their said petition or bill of complaint, the said grant of farther time aforesaid was made since the 24th day of January 1818, as appears by the showing of the petitioners themselves, and was and is rendered wholly null and void by the provisions of the latter clause of the eighth article of the treaty. And, that, if any such grant of the said lands was made as aforesaid, the said Fernando de la Maza Arredondo and son wrongfully represented to the said Alexander Ramirez, intendant, &c., as aforesaid, in order to obtain it, that the said lands had been abandoned by the said Indians and were vacant. And that it was in consequence of the said false, fraudulent and wrongful representations of the said Fernando de la Maza Arredondo and son, that he, the said Don Alexander Ramirez, intendant, &c., as aforesaid, declared the said lands to be crown lands, and granted them to the said Fernando de la Maza Arredondo and son; whereas, in truth, and in fact, the said lands were not vacant, nor abandoned by the said Indians, but that on the contrary, the said Indians had constantly been, and still were, possessed of the said lands, at the date of the said supposed grant, and that they had continually occupied the same, and had never left the said lands, unless they were driven off by a superior and lawless force, and then only temporarily: and, therefore, if the said grant was made, as is alleged in the said pe-

tition or bill of complaint, and the said Don Alexander Rami-rez, intendant, &c., as aforesaid, had been and was invested, by the Spanish government aforesaid, with competent power and authority to make the same, it was fraudulently and sur-reptitiously obtained, by imposing on the said Don Alexander Ramirez, intendant, &c., as aforesaid, a false representation of facts; and, as it might have been cancelled by the king of Spain on that ground, so it might now be cancelled by the sovereign authority of the United States: and that court of equity cannot, consistently with the principles which govern that tribunal, lend its aid to give effect to a grant obtained by fraud and misrepresentation. And the answer prays that the petitioners may be required to show and prove, on the hearing of the cause, the specific power and authority which had been conferred (if any such power had been conferred) by the Span-ish government, upon the said Don Alexander Ramirez, in-tendant, &c., as aforesaid, at the time when the said supposed grant is alleged to have been made as aforesaid, to make grants of land in East Florida, and, particularly, that they may be required to show and prove the specific power under which he claimed to act in making the said supposed grant of lands, and also the said grant of further time for the performance of the aforesaid conditions; if, indeed, any such grants were ever made by him, which is not admitted.

To the answer and the supplemental answer of the United States, the petitioners put in a general replication: and the case was regularly proceeded in to a hearing.

On the 1st of November 1830 a decree was given in favour of the petitioners; from which decree the United States ap-pealed to this court.

The evidence adduced in the court below, on the part of the petitioners, consisted of the proceedings and the testimony given before the commissioners of the United States, upon the claim presented for their consideration according to the pro-visions of the act of congress; and of additional documentary and oral evidence. Testimony was also given on the part of the United States to sustain the allegations in the answer, and applicable to the several matters therein contained. The particulars of the matters so exhibited in evidence are not in-serted in the report; as the opinion of the court, and the

dissenting opinion of Mr Justice Thompson, fully state the facts of the case, which were considered as established by this evidence.

The case was argued by Mr Call and Mr Wirt, with whom also was Mr Taney, attorney-general, for the United States: and by Mr White and Mr Berrien, with whom also was Mr Webster, for the appellees.

The counsel for the United States contended, that the decree of the superior court of the eastern district of Florida should be reversed, and the petition dismissed, on the following grounds:

1. The petitioner has not shown, what he was bound to show affirmatively, the authority of Alexander Ramirez to make the grant which the decree of the court has confirmed.

2. The intendant of the Island of Cuba was not authorized to make the grant in question; and it was made in violation of the laws and ordinances and royal regulations of the government of Spain.

3. The land in controversy was, at the time of the grant, within the Indian boundary established by the government of Great Britain during its occupancy of the Floridas, and subsequently acknowledged by the government of Spain; and was therefore not subject to be disposed of by the subordinate officers of the crown.

4. Conceding, for the sake of argument, that the intendant had the power to make the grant, the *sovereign power* alone could dispense with the conditions annexed to it; and no such power has been delegated to the judiciary.

5. The grantees failed to perform that condition of the grant which required them to commence the establishment of the two hundred Spanish families on the land, within three years from the date of the grant.

6. The grantees have not complied with the conditions of the grant which required them to settle two hundred Spanish families on the land.

7. The prolongation of time for the performance of the conditions of the grant, was given by the said intendant after the ratification of the treaty, by the king of Spain, which ceded Florida to the United States; and is consequently void for the want of authority.

8. The treaty and laws referred to in the decree, as the grounds of confirmation of the grant, do not justify it.

For the appellees, the following points were insisted upon:

1. By the terms of the treaty, all grants made by his catholic majesty, or his lawful authorities, are to remain valid.

The only questions for the consideration of this court, are: 1st. The genuineness of the grant. 2d. The lawfulness of the authority by which it was issued.

2. The decree, on which this grant is founded, is a judicial act, which cannot be drawn into question in the tribunals of the United States.

3. A genuine grant issued by a lawful authority of his catholic majesty, can only be impeached on the ground of fraud in obtaining it.

4. This grant was within the scope of the powers expressly given to the Spanish officer making it, by the laws of the Indies.

5. It was specifically authorized by the royal order of the 3d Sept. 1817.

6. There was no existing Indian title to these lands, at the date of the grant, which could have rendered it invalid.

7. The condition annexed to the grant has been performed.

8. It has been discharged by the act of the party imposing it.

Mr Justice BALDWIN delivered the opinion of the Court.

This is an appeal from the decree of the judge of the superior court for the eastern district of the territory of Florida.

After the acquisition of Florida by the United States, in virtue of the treaty with Spain, of the 22d of February 1819, various acts of congress were passed for the adjustment of private claims to land within the ceded territory. The tribunals appointed to decide on them, were not authorised to settle any which exceeded a league square; on those exceeding that quantity, they were directed to report especially their opinion for the future action of congress. The lands embraced in the larger claims, were defined by surveys and plats returned; they were reserved from sale, and remained unsettled until some resolution should be adopted for a final adjudication on their validity, which was done by the passage of the law of

[United States v. Arredondo and others.]

the 23d May 1828, pamph. 62. By the sixth section it was provided, "that all claims to land within the territory of Florida, embraced by the treaty, which shall not be finally decided and settled under the previous provisions of the same law, containing a greater quantity of land than the commissioners were authorised to decide, and above the amount confirmed by the act, and which have not been reported as antedated or forged, shall be received and adjudicated by the judge of the superior court of the district within which the land lies, upon the petition of the claimant, according to the forms, rules, regulations, conditions, restrictions and limitations prescribed to the district judge, and claimants in Missouri, by the act of the 26th May 1824." By a proviso, all claims annulled by the treaty, and all claims not presented to the commissioners, &c. according to the acts of congress, were excluded. (a)

(a) By a reference to the thirteenth and fourteenth lines in the sixth section of this law, as printed in the pamphlet edition, in page 62, it reads, "according to the forms, rules, &c. prescribed *by* the district judge and claimants in the state of Missouri, &c. by act of congress," &c. To have taken this expression literally, would have confined the superior court of Florida to the rules prescribed *by the judge of the district court of Missouri, and claimants;* by acts of congress of 1824. That act authorised the judge to prescribe no rules, and it was absurd to suppose it meant that the claimants themselves should prescribe them. The court, therefore, could not but consider the evident meaning of the law to be " rules," &c. prescribed by the law itself, and was so stated in the opinion, which was delivered one day sooner than had been expected, and there was no time for revision. Satisfied that there was an error in the printing, I examined the original roll in the department of state, yesterday, and found the mistake; the word *by* had been inserted in the printed law, instead of *to,* as it was in the original roll: so that the law reads, " the rules, &c. prescribed *to* the district judge and claimants *by* the act of congress." The important bearing of this word on the power of the court and the rules of its decision, has made the insertion of this note necessary, and as it may be useful in courts at a distance from the seat of government to have a correct copy of this section of the law, the following paper is directed to be appended; 20th March 1832. *Per Mr Justice Baldwin.*

I certify that the following is a true copy of the sixth section of an act of congress, approved the 23d of May 1828, entitled " an act supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida;" viz.

" Sec. 6. And be it further enacted, that all claims to land within the territory of Florida, embraced by the treaty between Spain and the United States, of the 22d of February 1819, which shall not be decided and finally settled under the foregoing provisions of this act, containing a greater quantity of land than the commissioners were authorised to decide, and above the amount confirmed by this act, and which have not been reported as antedated or forged, by said commissioners, or register and receiver acting as such, shall be received and adjudi-

The seventh section provided for an appeal by the claimants, and the ninth, by the United States to this court: the adjudication of the judge of the superior court having been rendered against the United States, the case comes before us by an appeal by them.

The law of 1824, which is thus referred to, and forms a part of that of 1828, furnishes the rules by which this court must be guided in assuming and exercising jurisdiction to hear and determine the claim in controversy. This law was passed to enable claimants to lands within the limits of Missouri and Arkansas, to institute proceedings to try the validity of their claims to land prior to the consummation of the cession of the territory acquired by the United States by the Louisiana treaty; and enacted, that any person, or their legal representative, claiming lands by virtue of any French or Spanish grant, concession, warrant, or order of survey, legally made, granted or issued, before the date of the 10th March 1804, by the proper authorities, to any persons resident in the province at the date thereof, which was protected and secured by the treaty, and which might have been perfected into a complete title, under and in conformity to the laws, usages and customs of the government under which the same originated, had not the sovereignty been transferred to the United States, may present his petition to the district court, setting forth the nature of his claim, the date of the grant, and quantity and boundary, by whom issued, and whether the claim had been submitted to any tribunal, and reported on by them, and how; praying that

cated by the judge of the superior court of the district within which the land lies, upon the petition of the claimant, according to the forms, rules, regulations, conditions, restrictions, and limitations prescribed to the district judge and claimants in the state of Missouri, by act of congress, approved May 26th, 1824, entitled ' an act enabling the claimants to land within the limits of the state of Missouri and territory of Arkansas, to institute proceedings to try the validity of their claims:' Provided, that nothing in this section shall be construed to authorise said judges to take cognizance of any claim, annulled by the said treaty or the decree ratifying the same by the king of Spain; nor any claim not presented to the commissioners or register and receiver, in conformity to the several acts of congress providing for the settlement of private land claims in Florida."

Faithfully compared with the roll in this office.

Witness my hand, at the department of state, in the city of Washington, this 20th day of March 1832.

(Signed) DANIEL BRENT, C. C.

the validity of their title and claim may be inquired into and be decided by the court. The court is authorised and required to hold and exercise jurisdiction of every petition presented in conformity with the provisions aforesaid, and to hear and determine the same on the petition, in case no answer be filed after due notice; or on the petition and the answer of any person interested in preventing any claim from being established, in conformity *with the principles of justice, and according to the laws and ordinances of the government under which the claim originated.* (3 Story's Laws U. S. 1959, 1960, sec. 1.)

A reference to the petition presented by the claimants in this case, shows that it contains a full statement of all the matters required by the first section of the Missouri law, excepting the condition of residence, which is not required by the act of 1828. Record, 1 to 22. It presents a claim for land in Florida, embraced by the treaty, not finally settled; containing the requisite quantity of land, not reported on as antedated or forged, not annulled by the treaty, presented to and acted on by the commissioners according to law. The superior court of Florida then had jurisdiction of the petition *to hear and determine the same,* according to the principles of justice and the laws and ordinances of Spain; and the case is now regularly before us on an appeal from their decree.

The power to hear and determine a cause is jurisdiction; it is *"coram judice,"* whenever a case is presented which brings this power into action; if the petitioner states such a case in his petition that on a demurrer the court would render judgment in his favour, it is an undoubted case of jurisdiction, whether on an answer denying and putting in issue the allegations of the petition, the petitioner makes out his case, is the *exercise of jurisdiction* conferred by the filing of a petition containing all the requisites and in the manner prescribed by law.

The proceedings on the petition are to be conducted according to the rules of equity, except that the answer on behalf of the United States need not be verified on oath.—*Sec. 2.*

This court has often decided that by these rules are meant the well settled and established usages and principles of the court of chancery, as adopted and recognized in their decisions, which have been acted on here, under the provisions of the

constitution and the acts of congress. In conformity with the principles of justice and the rules of equity, then, the court is directed to decide all questions arising in the cause, and by a final decree, to settle and determine the question of the validity of the title, *according to the law of nations, the stipulations of any treaty and proceedings under the same, the several acts of congress in relation thereto, and the laws and ordinances of the government from which it is alleged to be derived, and all other questions which may properly arise between the claimants and the United States,* which decree shall, in all cases, refer to the *treaty, law* or *ordinance* under which it is confirmed or decreed against. As these are made the basis of our decision, and this is the first final adjudication on those laws, we think it necessary to declare the sense in which we think they were intended by congress, as well as their plain legal import, agreeably to the rules of construction adopted by this court, or those which form the principle of the common law. It is not necessary to define what was meant by referring to the law of nations.

The numerous cases which have been adjudged by this, and in the circuit courts, make it wholly unnecessary to refer to the sources from which it has been extracted. By the stipulations of a treaty are to be understood its language and apparent intention manifested in the instrument, with a reference to the contracting parties, the subject matter, and persons on whom it is to operate. The laws under which we now adjudicate on the rights embraced in the treaty, and its instructions, authorise and direct us to do it judicially, and give its judicial meaning and interpretation as a contract on the principles of justice and the rules of equity. When the construction of this treaty was under the consideration of the court in the case of Foster and Elam v. Nelson, 2 Pet. 254, 99, it was under very different circumstances. The plaintiff claimed a title, the land in controversy under a Spanish grant prior to the treaty, which he alleged was confirmed by the eighth article; *he stood simply on his right, without any act of congress authorising the suit, or conferring on the court any extraordinary powers.* The first question which was decisive of the plaintiff's pretensions was whether the lands in contest were within the boundaries of Louisiana, as ceded in 1803, or within

Florida, as ceded in 1819. The boundary between the two territories had been for many years the subject of controversy and negotiation between the American and Spanish governments, the one claiming that Louisiana extended eastward of the Mississippi to the Perdido; the other that it did not extend on that side of the river beyond the island of Orleans, alleged to be separated from West Florida by the Iberville. To have decided in favour of the plaintiff would have been adopting the Spanish construction of the Louisiana treaty in opposition to the pretensions and course of this government, which had taken possession of and exercised the powers of government over the territory between the Mississippi and the Perdido.

This court did not deem the settlement of boundaries a judicial but a political question—that it was not its duty to *lead*, *but to follow* the action of the other departments of the government; that when individual rights depended on national boundaries, "the judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided, and its duty commonly is to decide upon individual rights according to those principles which the political departments of the nation have established." "If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous." "We think, then, however individual judges might construe the treaty of St Ildefonso, it is the province of the court to conform its decisions to the will of the legislature, if that will has been clearly expressed." 2 Peters, 307.

As to the other question depending on the stipulations of the eighth article, the court declared: *And the legislature must execute the contract before it can become a rule for the court.* 2 Peters, 314. But this case assumes a very different aspect. The only question depending is whether the claimants or the United States are the owners of the land in question. By consenting to be sued, and submitting the decision to judicial action, they have considered it as a purely judicial question, which we are now bound to decide as between man and man, on the same subject matter and by the rules which congress themselves have prescribed, of which the *stipulations* of *any treaty* and *the proceedings under the same*, form one of four

distinct ones.    We must therefore be distinctly understood as not in the least impairing, but affirming the principle of Foster v. Nelson.    As the law giving jurisdiction to hear and determine this case not only authorises but requires us to decide it according to the law of nations and the stipulations of the treaty, we shall consider, " that it has been very truly urged by the counsel of the defendant in error, that it is the usage of all the civilized nations of the world, when territory is ceded, to stipulate for the property of fits inhabitants.    An article to secure this object, so deservedly held sacred, in the view of policy, as well as of justice and humanity, is always required and is never refused."    Henderson v. Poindexter, 12 Wheat. 535.    When such an article is contained in a treaty of cession, and its meaning submitted to our consideration, we shall follow up and effectuate the intention of congress, by deeming the subject matter to be, whether the land in controversy was the property of the claimants before the treaty, and if so, that its protection is as much guarantied by the laws of a republic as the ordinances of a monarchy.    In so doing, we adopt and act upon another principle, contained in the opinion of this court in the same case, in alluding to the treaty of boundary between the United States and Spain, concluded on the 27th October, 1795.    " Had Spain considered herself as ceding territory, she could not have neglected a stipulation which every sentiment of justice and national honour would have demanded, and which the United States could not have refused."    Henderson v. Poindexter, 12 Wheat. 535.    Spain was not regardless of those sentiments.    She did not neglect; the United States did not refuse the stipulation in this treaty which did cede territory.    In the same spirit of justice and national honour the national legislature has required its highest judicial tribunal to finally decree on the effect of this stipulation on theirs and the rights of the claimants " according to the law of nations" which is " the usage of all civilized nations."    Such is the authority conferred on this court, and by the rules prescribed by the laws, which are our commission, we feel, in its language, " both authorised and required," " with full power and authority to hear and determine all questions arising in this cause relative to the title of the claimants, the extent, locality and boundaries of the said claim, or

[United States v. Arredondo and others.]

other matters connected therewith, fit and proper to be heard and determined, and by a final decree, to settle and determine the same according to the law of nations," 2d sec. act of 1824. Congress have laid this down as the first rule of our decision in the spirit of justice and national honour which pervades this law; the court will consider it as neither the last or least of its duties to embody it in such their final decree, if in their judgment the case before it calls for its application.

Our next rule of decision is—and proceedings under the treaty. By these are to be understood the acts and proceedings of the government, or others under its authority, subsequent to the treaty, in taking possession of the ceded territory, in organizing the local government, its acts within the authority of the organic law, the promises made, the pledges given by either the general or local government. Also the proceedings of commissioners and other officers or tribunals appointed by congress to decide, and report on these claims so far as they have adopted and settled any rules and principles of decision within their powers, as guides to their judgment. These, in our opinion, are the " proceedings under the same," referred to, and intended by, the law, according to which we may decide, and are made a rule, a precedent for us.

The next guide is, " the several acts of congress in relation thereto," clearly referring to the clause immediately preceding: " the stipulation of any treaty and proceedings under the same." By " the several acts of congress in relation thereto," must be taken as referring to all the laws on the subject matter of either, necessarily embracing lands, property and rights depending on the stipulations and proceedings so made and had. Thus the course of the legislature points to that of the judiciary, *it must be in the same path.*

Where congress have, by confirming the reports of commissioners or other tribunals, sanctioned the rules and principles on which they were founded, it is a legislative affirmance of the construction put by these tribunals on the laws conferring the authority and prescribing the rules by which it should be exercised; or which is to all intents and purposes of the same effect in law. It is a legislative ratification of an act done without previous authority, and this subsequent recogni-

tion and adoption is of the same force as if done by pre-existing power and relates back to the act done.

The next rule laid down for our direction is, " and the laws and ordinances of the government from which it is alleged to be derived." The laws of an absolute monarchy are not its legislative acts—they are the will and pleasure of the monarch expressed in various ways—if expressed in *any*, it is a law; there is no other law making, law repealing power—call it by whatever name—a royal order—an ordinance—a cedula—a decree of council—or an act of an authorised officer—if made or promulgated by the king, by his consent or authority, it becomes as to the persons or subject matter to which it relates, a law of the kingdom. It is emphatically so in Spain and all its dominions. Such, too, is the law of a Spanish province conquered by England. The instructions of the king to his governors are the supreme law of the conquered colony; magna charta, still less the common law, does not extend its principles to it—King v. Picton, 30 St. Tr. 8vo ed. 866. A royal order, emanating from the king, is a supreme law, superseding and repealing all other preceding ones inconsistent with it. The laws of the Indies, have not their force as such by any legislative authority vested in the council; their authority is by the express or implied expression of the royal will and pleasure; they must necessarily yield to an order, prescribing a new rule, conferring new powers abrogating or modifying previous ones.

The principle that the acts of a king are in *subordination* to the laws of the country, applies only where there is *any law of higher obligation* than his will; the rule contended for may prevail in a *British*, certainly not in a *Spanish* province. There is another source of law in all governments, usage, custom, which is always presumed to have been adopted with the consent of those who may be affected by it. In England, and in the states of this union which have no written constitution, it is the supreme law; always deemed to have had its origin in an act of a state legislature of competent power to make it valid and binding, or an act of parliament; which, representing all the inhabitants of the kingdom, acts with the consent of all, exercises the power of all, and its acts become binding by the authority of all; 2 Co. Inst. 58—Wills, 116. So it is

[United States v. Arredondo and others.]

considered in the states and by this court; 3 Dall. 400; 2 Peters, 656, 657.

A general custom is a general law, and forms the law of a contract on the subject matter; though at variance with its terms, it enters into and controls its stipulations as an act of parliament or state legislature; 2 Mod. 238; W. Black. 1225; Doug. 207; 2 D. and E. 263—264; 1 H. Bl. 7, 8; 2 Binney, 486, 487; 5 Binney, 287; 2 S. and R. 17; 8 Wh. 591, 592; 9 Wh. 584, 591; and the cases there cited from 4 Mass. 252; 9 Mass. 155; 3 Day, 346; 1 Caines, 43; 18 Johns. 230; 5 Cr. 492; 6 D. and E. 320; Day, 511; 5 Cr. 33. The court not only may, but are bound to notice and respect general customs and usage as the law of the land, equally with the written law, and, when clearly proved, they will control the general law; this necessarily follows from its presumed origin,—*an act of parliament or a legislative act.* Such would be our duty under the second section of the act of 1824, though its usages and customs were not expressly named as a part of the laws or ordinances of Spain. The first section of that act, giving the right to claimants of land under titles derived from Spain, to institute this proceeding for the purpose of ascertaining their validity and jurisdiction to the court to hear and determine all claims to land which were protected and secured by the treaty, and which might have been perfected into a legal title under and in conformity to the laws, *usages,* and *customs* of Spain; makes a claim founded on them one of the cases expressly provided for. We cannot impute to congress the intention to not only authorize this court, but to require it to take jurisdiction of such a case, and to hear and determine such a claim according to the principles of justice; by such a solemn mockery of it as would be evinced by excluding from our consideration *usages* and *customs,* which are the law of every government, for no other reason than that in referring to the *laws* and ordinances in the second section, congress had not enumerated all the kinds of laws and ordinances by which we should decide whether the claim would be valid if the province had remained under the dominion of Spain. We might as well exclude a royal order because it was not called a law. We should act on the same principle, if the words of the second section were less explicit, and ac-

cording to the rule established in Henderson v. Poindexter. See 12 Wh. 530, 540.

We are also required to finally decide "all other questions properly arising between the claimants and the United States."

There is but one which has arisen in this case which does not refer to the laws of nations, the treaty and proceedings under it, the acts of congress, or the laws of Spain,—that is, the question of fraud in making the grant which is the foundation of the plaintiff's title; which, as well as all others, we must, by the terms of the law, decide "in conformity with the principles of justice." We know of no, surer guides to the principles of justice, than the rules of the common law, administered under a special law, which directs, (section second) "that every petition which shall be presented under the provisions of this act, shall be conducted according to the rules of a court of equity," and it does not become this tribunal to acknowledge that the decisions of any other are to be deemed better evidence of those rules or the principles of justice.

In Conard versus Nicoll, a great and lamented judge thus defined fraud: "The first inquiry is, what is fraud? From a view of all that has been said by learned judges and jurists upon this subject, it may be safely laid down, that to constitute actual fraud between two or more persons to the prejudice of a third, *contrivance* and *design* to injure such third person by depriving him of some right, or otherwise impairing it, must be shown."

He laid down three rules, which were incontrovertible:—

"1. That actual fraud is not to be presumed, but ought to be proved by the party who alleges it.

"2. If the motive and design of an act may be traced to an honest and legitimate source equally as to a corrupt one, the former ought to be preferred. This is but a corollary to the preceding principle.

"3. If the person against whom fraud is alleged, should be proved to have been guilty of it in any number of instances, still if the particular act sought to be avoided be not shown to be tainted with fraud, it cannot be affected by these other frauds, unless in some way or other it be connected with or form a part of them."

This court unanimously adopted these principles as the max-

ims of the common law; 4 Peters, 295, 296, 297, 310; and will be governed by them in this case in their opinion on the question of fraud.

The next subject for our consideration is, the evidence on which we are to decide. The third section of the act is as follows: "That the evidence which has been received by the different tribunals which have been constituted and appointed by law to receive such evidence, and to report the same to the secretary of the treasury, or to the commissioners of the general land office, upon all claims presented to them, respectively, shall be received and admitted in evidence for or against the United States, in all trials under this act, when the person testifying is dead or beyond the reach of the court's process, together with such other testimony as it may be in the power of the petitioner, the person or persons interested in the defence made against establishing any claim, or the United States' attorney to produce; *and which shall be admissible according to the rules of evidence and the principles of law."*

These provisions of the act of 1824 are applicable to this case; they have not been altered by the act of 1828, and by the eighth section are expressly extended to the Florida claims. They are liberal—worthy of the government which has adopted and made them the rules by which to test the rights of private claimants to portions of the land embraced in the ceded territory. From a careful examination of the whole legislation of congress on the subject of the Louisiana and Florida treaties, we cannot entertain a doubt that it has from their beginning been intended that the titles to the lands claimed should be settled by the same rules of construction, law and evidence, in all their newly acquired territory. That they have adopted as the basis of all their acts, the principle that the law of the province in which the land is situated is the law which gives efficacy to the grant, and by which it is to be tested, whether it was *properly* at the time the treaties took effect.

The United States seem never to have claimed any part of what could be shown by legal evidence and local law to have been severed from the royal domain before their right attached. In giving jurisdiction to the district court of Missouri to decide on these claims, the only case expressly excepted is that of Jacques Glamorgan (in section 12, 3 Story L. U. S. 1964); and in the corresponding law, as to Florida; those annulled by the

treaty, and those not presented in time, according to the acts of congress (section 6, pamphlet 62).

The United States have by three cessions acquired territory, within which there have been many private claims to land under Spanish titles.     The first in point of time was by the compact with Georgia, in 1802, by the terms of which it was stipulated —"That all persons who, on the 27th October 1795, were actual settlers within the territory thus ceded, shall be confirmed in all their grants, legally and fully executed prior to that day, by the former British government of West Florida, or by the government of Spain." (1 Laws, 489.)

The stipulations of the treaties by which they acquired Louisiana and Florida, contained provisions of a similar nature as to claims to land under Spain before the cession.

The whole legislation of Congress, from 1803 to 1828, in relation to the three classes of cases, so far as respected Spanish titles, is of an uniform character on cases of a corresponding description.     The rules vary according to the kind of title set up; distinctions have been made in all the laws between perfect or complete grants, fully executed, or inchoate incomplete ones, where a right had been in its inception, under or by colour of local law or authority, but required some act of the government to be done to complete it.     Both classes have been submitted to the special tribunals appointed to settle, to report finally or specially upon them, and the claimants have, under certain circumstances, been permitted to assert their rights in court by various laws, similar in their general character, but varying in detail to meet the cases provided for.

They are too numerous to be noticed in detail—some will be referred to hereafter; but it is sufficient for the present to observe, that from the whole scope and spirit of the laws on the subject of Spanish titles, the intention of congress is most clearly manifested, that the tribunals authorised to examine and decide on their validity, whether special or judicial, should be governed by the same rules of law and evidence in their adjudication on claims of the same given character.     The second and third sections of the Missouri act of 1824, the first, sixth, and eighth of the Florida act of 1828, can admit of no other construction.     It was within the discretion of the legislature to select the cases to be submitted to either tribunal;

[United States v. Arredondo and others.]

they have directed that no claims should be decided on by a special tribunal which is for a quantity greater than one league square; they had reserved to themselves the disposition of those for a larger amount, and finally have devolved on this court their final decision.    These are good reasons for the jurisdiction being conferred—but the selection of this tribunal for a final and conclusive adjudication on the large claims, affords neither an indication of the intention of congress, or furnishes us any reason; that in the exercise of that jurisdiction, we should consider that " the principles of justice," the rules of a court of equity, "the law of nations," of treaties "of congress," or of "Spain," the rules of evidence, or the "principles of law," can be at all affected by the magnitude of the claim under consideration.    The laws which confer the authority and point to the guides for its exercise, make no such discrimination, and every "principle of justice" forbids it. By the laws of congress on this subject, however, we must be distinctly understood as not comprehending those which have been passed on special cases or classes of cases, over which they had delegated to no tribunal power to decide, but which were disposed of according to circumstances of which they chose to be the exclusive judge.    There is another duty imposed on the court by the second section of the act of 1824, after making a final decree; "which decree shall, in all cases, refer to the treaty, law, or ordinance, under which it is confirmed or decreed against;" so that we may make a final decree to settle and determine the validity of the title according to either the law of nations, "the stipulations of any treaty, law, or ordinance" referred to; and if, by either the one or more rules of decision thus prescribed, we shall be of opinion that the title of the claimants was such as might have been perfected into complete title under and in conformity to the laws of Spain; if the sovereignty of the country had not been transferred to the United States, in the words of the Missouri law of 1824; or which were valid under the Spanish government, or by the laws of nations, and which were not rejected by the treaty ceding the territory of East and West Florida to the United States, in the words of the Florida laws of 1822—and 1823, 3 Story, 1870, 1907, referred to and adopted in that of 1828, we can decree finally on the title.    These laws being in "*pari*

*materia,"* and referred to in the one giving us jurisdiction, must be taken as one law, "reddendo singula singulis."

The counsel of the United States have considered the merits of this case as resting mainly, if not wholly, on the eighth article of the treaty; but the law compels us to take a view of it much less limited. That article names only grants; and if we decide alone on it, we must decree against the claim, unless we think the title good under it; though if it was for a quantity not exceeding a league square, any other tribunal would confirm it. This would be making a distinction so unworthy a just legislature, that we shall not impute to them the intention of directing it to be the rule of our action. We shall certainly not adopt it unless it is clearly imposed by the authority of a law expressed in terms admitting of no doubt.

The fourth section of the Florida act of 1822, 3 Story, 1870, enacts that every person claiming title to lands under any patent, grant, concession, or order of survey, dated previous to 24th January 1818, which were valid under the Spanish government, or the laws of nations, and which were not rejected by the treaty, shall file his, her, or their claim, &c. "And said commissioners shall proceed to examine, and determine on the validity of said patents, grants, concessions and orders of survey agreeably to the laws and ordinances heretofore existing of the governments making the grants respectively, having due regard in all Spanish claims, to the conditions and stipulations contained in the eighth article of the treaty of 22d of February" 1819. The intention of this provision cannot be misunderstood; due regard must be had to this article, it must be considered, weighed, and deliberated upon in connexion with the other matters which form the rule of decision. A decree may be founded upon the stipulations of the treaty and proceedings under it—or it may be independent of them, according to the laws of nations, congress, or Spain; each of which is of as high obligation as the treaty and on either of which alone we may found our decree. Though the term "law of nations" is not carried into the second clause of the fourth section of the act of 1822, yet we consider it a rule of decision for the reasons before stated, and on the authority of Henderson v. Poindexter—the manifest object of the law in directing those claims to be filed, which are valid by the

law of nations, is, that they shall be adjudicated on accordingly by the authorized tribunal.—To impute to congress the intention of directing them to be filed, described, and recorded; and forever barred if not so recorded, and of ordering the tribunal to examine and decide on their validity, and in the same sentence withhold from the same tribunal the power of doing it, by the principles of the same law on which they were founded and by which they were made valid; would be utterly inconsistent with every rule of law. The sixth section of the act of 1828, is still more comprehensive, it provides that all claims to land, within the territory of Florida, embraced by the treaty of 1819, which shall not be decided and finally settled under the foregoing provisions of this act, containing a greater quantity of land, &c. and which have not been reported on as antedated or forged by the commissioners, not annulled by the treaty and reported on by the commissioners, shall be received and adjudicated by the judge of the superior court of the district (see pamphlet, 62). This includes all claims—the former laws included only those specially designated—this embraced all not before decided, and not finally settled, with only two exceptions—one as to quantity, the other as to date and forgery. Whether then the present claim is by patent, grant, concession, warrant, or order of survey, or any other act which might have been perfected into a complete title, by laws, usages, and customs of Spain, is immaterial as to our power to hear and determine. The fifth section of the Missouri act (3 Story, 1962), and the twelfth section of the Florida act (pamphlet, 63), finally bars at law and in equity all claims to lands, tenements, and hereditaments within their purview, which are not brought by petition before the court. They are of course not cognizable by them.

We now proceed to consider the validity of the present claim.—The claimant offered and gave in evidence an original grant, from Don Alexandre Ramirez, styling himself, "intendant of the army, subdelegate superintendent general of the royal domain of the island of Cuba, and the two Floridas," &c. &c. It purported to convey the land in controversy to Arredondo and Son, to have been made in the exercise of the faculties which had been conferred on Ramirez by the king; it was made in the royal name for the number of acres of land,

under the limits, courses, and distances pointed out in the figu-
rative plot.    In order that they may possess the same as their
own property, and enjoy it as the exclusive owners thereof;
and in the terms mentioned in the decree therein recited—
with an absolute dominion over and full property in it.    The
grant purports to be made on great deliberation and in solemn
form; as a sentence in the official capacities which were as-
sumed, "upon examination and in virtue of the royal order of
3d of September of the present year, in which his majesty
having appointed me superintendent of the two Floridas, de-
sires me in the strongest terms to procure the settlement of
these provinces by every means which my zeal and prudence
can suggest."    "In conformity with the fiscal (the attorney-
general) and the report made by the surveyor general, I de-
clare as crown property the territory of Alachua" (the lands
in question).    The grant then followed, "signed with my
hand, sealed with the royal arms, as used in my secretary's
office, and countersigned by the commissary at war, Don Pedro
Cerambat, secretary for his majesty in this intendency," and
"registered in the book for that purpose in the office under
the secretary's charge."    No objection appears to have been
made to the admission of this paper in evidence; its genuine-
ness seems not to have been contested—no attempt was made
to impeach it as antedated or forged, and its due execution in
all the forms known to the local government was unquestioned.
It was therefore before the court below, and is so here, at least,
prima facie evidence of a grant of the land it describes to the
claimants, the rules of evidence and the principles of law give
it this effect and so it must be considered.    Here an important
question arises—whether the several acts of congress relating to
Spanish grants do not give this grant and all others which are
complete and perfect in their forms "legally and fully exe-
cuted," a greater and more conclusive effect as evidence of a
grant by proper authority.

It is but a reasonable presumption that congress in legislat-
ing on the subject of Spanish grants in the three territories
which they have acquired since 1802, and in devising and
providing efficient means for the ascertaining and finally set-
tling all claims of title under them by persons asserting that
the lands they claimed had been severed from the public

domain before the cessions of the territory to the United States. That when they have by a series of laws from 1803, to 1828 authorized special and subordinate tribunals to decide on claims to the extent of a league square, inferior courts to decide on all claims to any amount, and finally, if no appeal is taken; and this court to pronounce a final decree on appeal, which may separate millions of acres from the common fund. They would have made what was deemed adequate provision to guard the public from spurious grants, by prescribing for the various tribunals authorized to decide on "claims such rules of evidence applicable to those grants as would secure the interest of the nation from fraud and imposition." Yet, in their whole legislation on the subject (which has all been examined), there has not been found a solitary law which directs; that the authority on which a grant has been made under the Spanish government should be filed by a claimant—recorded by a public officer, or submitted to any tribunal appointed to adjudicate its validity and the title it imparted—congress has been content that the rights of the United States, should be surrendered and confirmed by patent to the claimant, under a grant purporting to have emanated under all the official forms and sanctions of the local government. This is deemed evidence of their having been issued by lawful, proper, and legitimate authority—when unimpeached by proof to the contrary.

In providing for carrying into effect the stipulations of the compact of cession with Georgia, the fifth section of the act of 1803 provides. That all persons claiming land pursuant thereto should before the 1st March 1804, deliver to the register of the land office, in the proper district, a notice containing a statement of the nature and extent of his claim and a plot thereof; also, for the purpose of being recorded; every grant, order of survey, deed of conveyance, or other written evidence of his claim—in default whereof all his right, so far as depended on the cession, or the law was declared void—forever barred—and the grant inadmissible in any court in the United States against any grant from them. (2 Story, 894, 895.) By the sixth section, it was provided, that when it should be made to appear to the commissioners that the claimant was entitled to a tract of land under the cession in virtue of a *Spanish or British grant legally and fully executed,* they

were directed to give him a certificate which amounted to a relinquishment of the claim of the United States for ever, when recorded. The fact which gave to the recorded certificate of the commissioners the effect of a patent, was the existence of a grant; the legality and fullness of its execution only was required to be made to appear. No inquiry was directed to be made as to the *authority* by which it was done; the United States were too just to exact from the grantees of land under an absolute colonial government what no court requires from one who holds lands under the grant of the United States or of a state fully executed: or if inchoate never compels a claimant to produce the authority of the officer who issues or executes a warrant or order of survey; it is always presumed to be done regularly till the contrary appears, or such reasons are offered for doubting its authenticity, as are sufficient in law to rebut the legal presumption. By the first section of the supplementary act of 1804, claimants by complete British or Spanish grants are required to record no evidence of their claim except *the original grant or patent* with the warrant or order of survey and the plat—the other papers were to be deposited with the register of the land office, in order to be laid before the commissioners for their consideration. (Act of March 27, 1804, 2 Story, 952.)

As no law required the exhibition of the authority under which a grant warrant, or order of survey was made; as it formed a part of the evidence of title to be recorded, deposited, or acted on by the commissioners, they were not authorized to call for it before making their decision.

*The grant legally and fully executed* was competent evidence of the matters set forth in it, and as none other was necessary it was in effect conclusive. But congress thought it proper to *authorise* the commissioners not to confine their examination to the mere execution of the alleged grant. By the third section of the same law it is provided as follows. " Or whenever either of the said boards *shall not be satisfied* that such grant, warrant or order of survey, did issue at the time it bears date, the said commissioners shall not be *bound to consider such grant*, warrant, or order of survey *as conclusive evidence of the title*, but *may require* such *other proof* of its validity; as they may think proper."—Nothing can more

clearly manifest the understanding of congress that such grant, &c. was conclusive evidence of title, and that the commissioners were not under the existing laws, at liberty to require from the claimants any other proof, than their conferring on them by express words the power of doing so.   " Expressio unius est exclusio alterius," is an universal maxim in the construction of statutes.

In the law of the succeeding session, passed for ascertaining and adjusting the titles and claims to land within the territory of Orleans and district of Louisiana, it was directed that the evidence of claims to land should be recorded—but there was this proviso in the fourth section: " That where lands are claimed by virtue of a complete French or Spanish grant as aforesaid, it shall not be necessary for the claimant to have any other evidence of his claim recorded, *than the original grant or patent;* together with the warrant or order of survey, and the plot." Other provisions follow similar to those in the preceding law relating to claims included in the articles of agreement, with Georgia.   (2 Story, 967, 968.)   By the fifth section the commissioners are directed to " decide in a summary manner, according to justice and equity, on all claims filed with the register and recorder, in conformity with the provisions of this act, and on all *complete French or Spanish grants, the evidence of which, though not thus filed, may be found of record on the public records of such grants,* which decision shall be laid before congress in the manner hereinafter directed, and be subject to their determination thereon."   The commissioners shall not be bound to consider such grant, warrant, or order of *survey as conclusive evidence of title,* when they were not satisfied that it issued at the time it bears date, but that the same is antedated or *otherwise fraudulent,* they may then require such other proof of its validity as they may think proper.   By proof of validity must be understood of its genuineness and authenticity, and that it is not fraudulent; so as to satisfy themselves as to those doubts *which authorized them* to require further proof than the grant itself, of its legal, full and fair execution; not of the authority of the officer who made it —*no law gives power to exact proof of that.*   This act of congress proves, that by considering *the recorded grant as conclusive evidence of title,* (which cannot be without power in

the grantor) unless it is antedated or otherwise fraudulent, the authority of the officer making it was presupposed.

The act of 1822, for ascertaining claims and titles to land in the territory of Florida (3 Story, 1870)—directs all persons claiming title to lands under any patent, grant, concession or order of survey, to file before the commissioners their claim, "setting forth its situation and boundaries, if to be ascertained, with their deraignment of title, where they are not the grantees or original claimants," which shall be recorded, &c. section 4. This dispenses with the filing the *warrant or order of survey*, the *survey or plot* required by the laws relating to both the Georgia and Louisiana claims, as they need not set forth or file their deraignment of title, where they claim by a grant, patent, &c. to themselves. The direction of the law can apply only to such grant or patent, &c.; this being filed and recorded; the fifth section enacts, "that the commissioners shall have power to inquire into the validity and justice of the claims filed with them, and if satisfied that said claims be correct and valid, shall give confirmation to them, which shall operate as a release of any interest which the United States may have." The second section of the act of 1823, supplementary to the last, dispenses with the necessity of producing in evidence, before the commissioners, the deraignment of title from the original grantee or patentee; but the commissioners shall confirm every claim in favour of actual settlers at the time of the cession, &c. when the quantity "claimed does not exceed three thousand five hundred acres." (3 Story, 1907.) By the act of 1824, for extending the time limited for the settlement of private land claims in the territory of Florida, "the claimants shall not be required to produce in evidence a deraignment of title from the original grantee or patentee, but the exhibition of the *original title papers, agreeably to the fourth section of the act of* 1822, with the deed or devise to the claimant, and the office abstracts of the intermediate conveyances for the last ten years preceding the surrender of Florida to the United States; and when they cannot be produced, their absence being accounted for satisfactorily, *shall be sufficient evidence of the right of the claimant or claimants to the land so claimed, as against the United States.*" —(3 Story, 1935, section 2.)

[United States v. Arredondo and others.]

It is thus clearly evidenced, by the acts, the words, and intentions of the legislature, that in considering these claims by the special tribunals, the authority of the officer making the grant, or other evidence of claim to lands, formed no item in the title it conferred; that the United States never made that a point in issue between them and the claimants to be even considered, much less adjudicated. They have submitted to the principle which prevails as to all public grants of land, or acts of public officers, in issuing warrants, orders of survey, permission to cultivate or improve, as evidence of inceptive and nascent titles, which is; that the public acts of public officers purporting to be exercised in an official capacity and by public authority, shall not be presumed to be an usurped, but a legitimate authority, previously given or subsequently ratified, which is equivalent. If it was not a legal presumption that public and responsible officers claiming and exercising the right of disposing of the public domain, did it by the order and consent of the government, in whose name the acts were done, the confusion and uncertainty of titles and possessions would be infinite, even in this country; especially in the states whose tenures to land depend on every description of inceptive, vague and inchoate equities, rising in the grade of evidence, by various intermediate acts, to a full and legal confirmation, by patent, under the great seal.

To apply the principle contended for to the various papers which are sent from the general or the local land offices, as instructions to officers under their direction; or evidence of incomplete title to land, by requiring any other evidence of the authority, by which it was done than the signature of the officer, the genuineness of the paper, proved by witnesses or authenticated by an official seal, would be not only of dangerous tendency, but an entire novelty in our jurisprudence, as "a rule of equity or evidence," or "principle of law or justice." The judicial history of the landed controversies, under the land laws of Virginia and North Carolina, as construed and acted on within those states, and in those where the lands ceded by these states to the United States lie, and Pennsylvania, whose land tenures are very similar in substance, in all which the origin of titles is in very general, vague, inceptive equity; will show the universal adoption of the rule, that the

acts of public officers in disposing of public lands, by colour or claim of public authority, are evidence thereof until the contrary appears by the showing of those who oppose the title set up under it and deny the power by which it is professed to be granted. Without the recognition of this principle, there would be no safety in title papers, and no security for the enjoyment of property under them. It is true that a grant made without authority is void under all governments—9 Cr. 99, 5 Wh. 303,—but in all the question is on whom the law throws the burthen of proof, of its existence, or non-existence. A grant is void, unless the grantor has the power to make it—but it is not void because the grantee does not prove or produce it. The law supplies this proof by legal presumption, arising from the full, legal, and complete execution of the official grant, under all the solemnities known or proved to exist or to be required by the law of the country where it is made and the land is situated.

A patent under the seal of the United States or a state is conclusive proof of the act of granting by its authority; its exemplification is a record of absolute verity. Patterson v. Winn, 5 Peters, 241.

The grants of colonial governors, before the revolution, have always been, and yet are, taken as plenary evidence of the grant itself, as well as authority to dispose of the public lands. Its actual exercise, without any evidence of disavowal, revocation, or denial by the king, and his consequent acquiescence and presumed ratification, are sufficient proof in the absence of any to the contrary (subsequent to the grant) of the royal assent to the exercise of his prerogative by his local governors. This or no other court can require proof that there exists in every government a power to dispose of its property; in the absence of any elsewhere, we are bound to presume and consider, that it exists in the officers or tribunal who exercises it, by making grants, and that it is fully evidenced by occupation, enjoyment, and transfers of property, had and made under them, without disturbance by any superior power, and respected by all co-ordinate and inferior officers and tribunals throughout the state, colony or province where it lies.

A public grant, or one made in the name and assumed authority of the sovereign power of the country, has never been

considered as a special verdict; capable of being aided by no inference of the existence of other facts than those expressly found or apparent by necessary implication, an objection to its admission in evidence on a trial at law, or a hearing in equity, is in the nature of a demurrer to evidence on the ground of its not conducing to prove the matter in issue.

If admitted, the court, jury, or chancellor, must receive it as evidence both of the facts it recites and declares, leading to and the foundation of the grant, and all other facts legally inferable by either from what is so apparent on its face. Taking, then, as a settled principle, that a public grant is to be taken as evidence that it issued by lawful authority, we proceed to examine the legal effect of a Spanish grant in adjudicating on their validity, by the principles of justice in a court; and by the rules of equity, evidence, and law, directed by the act of 1824, which forms a part of the law under which their validity is submitted to our judicial consideration.

The validity and legality of an act done by a governor of a conquered province, depends on the jurisdiction over the subject matter delegated to him by his instruction from the king, and the local laws and usages of the colony, when they have been adopted as the rules for its government. If any jurisdiction is given, and not limited, all acts done in its exercise are legal and valid; if there is a discretion conferred, its abuse is a matter between the governor and his government, &c.; King v. Picton, late governor of Trinidad, 30 St. Tr. 869–871.

It is an universal principle, that, where power or jurisdiction is delegated to any public officer or tribunal over a subject matter, and its exercise is confided to his or their discretion; the acts so done are binding and valid as to the subject matter; and individual rights will not be disturbed collaterally for any thing done in the exercise of that discretion within the authority and power conferred. The only questions which can arise between an individual claiming a right under the acts done, and the public, or any person denying its validity, are, *power in the officer, and fraud in the party.* All other questions are settled by the decision made or the act done by the tribunal or officer; whether executive, (1 Cr. 170–171)— legislative, (4 Wh. 423; 2 Peters, 412; 4 Peters, 563)—judi-

cial, (11 Mass. 227; 11 S. & R. 429; adopted in 2 Peters, 167, 168); or, special, 20 J. R. 739, 740; 2 Dow. P. Cas. 521, &c. unless an appeal is provided for, or other revision, by some appellate or supervisory tribunal, is prescribed by law.

The principles of these cases are too important not to be referred to, and though time does not admit of their extraction and embodying in our opinion, we have no hesitation in declaring that they meet with our entire concurrence, so far as applicable to this case. But there are other cases which have been decided by this court, which have, in our opinion, so direct a bearing on the effect and validity of the grant in question, as to deserve a close examination; they will be considered in their order.

In Polk's lessee against Wendell, various objections were made to the validity of a grant from the state of North Carolina, as not having issued under the authority of law. The court laid down this general principle: "But there are cases in which a grant is absolutely void; as when the state has no title to the thing granted, or where the officer had no authority to issue the grant," (9 Cr. 99; repeated in the same case, 5 Wh. 303). In a succeeding part of their opinion, they observe, in allusion to the law of the state—"This act limits the amount for which an entry may be made, but the same person is not in this act *forbidden* to make different entries, and entries were transferable. No prohibition appears in the act which should prevent the assignee of several entries, or the person who has made several entries, from uniting them in one survey and patent." (9 Cr. 85). "The laws for the sale of public lands provide many guards to secure the regularity of grants, to protect the incipient rights of individuals, and also to protect the state from imposition. Officers are appointed to superintend the business, and rules are framed prescribing their duty. These rules are in general directory, and where all the proceedings are completed, by a patent issued by the authority of the state, a compliance with these rules is pre-supposed. That every prerequisite has been performed, is an inference properly deducible, and which every man has a right to draw from the existence of the grant itself. It would therefore be extremely unwarrantable for any court to avoid a grant for any irregularities in the conduct of those who are appointed by the govern-

ment to supervise the progressive course of a title from its commencement to its confirmation in a patent;" 9 Cr. 99. In a review of their opinion, it is laid down, " As to what validity shall be given to the grants emanating from North Carolina, the decision places it upon the statutes of North Carolina; and although an opinion is expressed, that North Carolina could make no new grants after the cession, to congress, who could entertain a doubt upon the question? The right referred to here, was to perfect incipient grants; but *what restraint is imposed on her discretion, or what doubt suggested of her good faith in executing that power?* It will be perceived, that as to irregularities committed by the officers of government, prior to the grant, the court does not express a doubt but that the government and not the individual must bear the consequences resulting from them." 5 Wh. 304. They refer to the rule as to the patents laid down in the former case, and add: " But in admitting that the grant shall support the presumption that every prerequisite existed, it necessarily admits that a warrant shall be evidence of the existence of an entry: nor is it by any means conclusive to the contrary, that the entry does not appear upon the abstracts of entries in Washington county, recorded in the secretary's office; on the contrary, if the warrants issued are signed by the entry taker, it is conclusive that the locations were received by him; and if he omitted to enter them, his neglect ought not to prejudice the rights of him in whose favour the warrants were issued." 5 Wh. 304, 305. This is a very important principle applying to all imperfect grants, concessions, warrants, and orders of survey. That the production of either is legal evidence, from which the legal presumption arises, that all preceding acts necessary to give it legal validity, have been done before it issued.

Another equally so was established in that case: " There was one point made in the argument of this case, which, from its general importance, deserves our serious attention, and which may have entered into the views of the circuit court in making their decision. It was, whether admitting this grant to be void, innocent purchasers, without notice, holding under it, should be affected by its nullity. On general principles it is incontestable, that a grantee can convey no more than he possesses. Hence, those who come in under the holder of a void

grant, can acquire nothing; but it is clear that the courts of Tennessee have held otherwise. Yet the North Carolina act of 1777, certainly declares grants attained by fraud, to be absolutely void: and the same result must follow, where the state has relinquished its power to grant, or no law exists to support the validity of the grant. But it seems that the courts of Tennessee have adopted this distinction, that grants in such cases shall be deemed void only as against the state, and not then until adjudged so by some process of law. If this be the settled law of Tennessee, we are satisfied that it should rest on the authority of adjudication." 5 Wh. 309. This evidences the respect paid by this court to local common law, which is but custom and usage, although opposed to general principles which are incontestable. "Hence this court has never hesitated to conform to settled doctrines of the state on landed property, when they are fixed and can be satisfactorily ascertained; nor would it ever be led to deviate from them in any case that bore the semblance of impartial justice." 5 Wh. 302. The same principle applies to those of a territory, and to Florida, by the act of 1824. In Hoofnagle against Anderson, a patent had issued for lands in the Virginia military district, in Ohio, on a continental warrant, issued by the register of the land office, without authority by law or a certificate of the governor, for *state* services. The question on which the title depended was, whether the illegality of the warrant could be inquired into after the grant by a patent; on which the opinion of the court was given in these words: "But this reference to the certificate of the executive, appears on the face of every warrant, and contains no other information than is given by law; the law requires this certificate as the authority of the register. It is considered as a formal part of the warrant. These warrants are by law transferable. *They are proved by the signature of the officer and seal of office.* The signature and seal are considered as full proof of the rights expressed in the paper;—no inquiry is ever made into the evidence received by the public officer. If the purchaser of such a paper takes it subject to the risk of its having issued erroneously, there ought to be some termination to this risk. We think it ought to terminate when the warrant is completely merged in a patent, and the title consummated without having encountered an adversary claim." 7 Wh. 217, 218.

A reference to the decisions of this court on titles in Florida, will show how they have been heretofore considered: " It is true, that the act of the 3d of March 1803, although making no express provision in favour of British or Spanish grants, unaccompanied with possession, does seem to proceed upon the implication that they are valid, recognising the principle that a change of policy produces no change in individual property, yet it imputes to them only a modified validity;" (referring to the necessity of their being recorded, and the consequence of not doing it.)  Harcourt against Gallard, 12 Wheat. 528.  Had that claim been so recorded, and come before the court under a law and circumstances similar to this, there could have been no doubt of what its opinion would then have been.  In the next case, after reciting the first section of the act of 1803, the court say: "This section places those persons who had obtained a warrant or order of survey, before 27th October 1795, on equal ground with those whose titles were completed."  After reciting the residue of that act and the preceding one of 1804, they express a very strong opinion that a British or Spanish grant was cognizable before the commissioners appointed under those laws, though held by persons not residents of the country.  That the commissioners might have decided in favour of its validity, and that such decision would have been conclusive.  Henderson v. Poindexter, 12 Wheat. 536 to 543.  The claim in that case was for fifteen hundred acres; but the title was not recorded or the claim laid before the commissioners, and it was not of course embraced in the provisions of any act of congress authorizing any court to decide on the title.  We conclude this review of the acts of congress and the decisions of this court, with repeating their words in Rutherford v. Green:  "Whatever the legislative power may be, its acts ought never to be so construed as to subvert the rights of property, unless its intention to do so shall be expressed in such terms as to admit of no doubt, and to show a clear design to effect the object.  No general terms intended for property, to which they may be fairly applicable and not particularly applied by the legislature, no silent implied and constructive repeals ought ever to be understood as to divest a vested right."  2 Wheat. 203.  The course of the argument, the situation of the country in which the land

is situated, and the numerous titles depending on the principles which have been so fully discussed, has induced us to meet them fully and explicitly—they will narrow the scope of argument in future cases.

The claimants in this case did not rest their title merely on the grant. It appeared in evidence, by authentic documents, that, in 1816, a controversy arose between the captain general and the intendant of the Island of Cuba, as to the superintendency of the royal domain of the Floridas, which being referred to the king, he, by a royal order of the 3d September 1817, conferred it on the intendant, Ramirez, " commanding him therein to facilitate the increase of the population of those provinces by all the means which his zeal and prudence could dictate." This is the order recited in the grant, and the authority under which it was made; with the general superintendency of the domain of the provinces, the local authorities acting under his direction and supervision, and acting under the command contained in the order; we can have no hesitation in saying that the grant in question was within the authority thus conferred. This order was a supreme law, superseding all others so far as it extended; its object was to increase the settlement and population of the whole province, which could only be done by corresponding grants of land adequate in extent to their desired effect. The power to do it was ample, and the means confided to the discretion of the officer, which was not limited. We cannot say that in executing this grant, he has acted without authority. Our opinion, therefore, is that both on the general principles of law and the acts of congress, the grant is perfect and valid, and even if a special authority was requisite, that it is conferred by the royal order referred to. The bearing of the law of nations on such a title, and property thus acquired, while the province was in the possession and undisputed dominion of Spain, is manifest according to its principles, recognized and affirmed by this court—12 Wheat. 535, before cited at large—no article of the treaty professes to abrogate these rights, and all the laws of congress treat them as still subsisting, and they are now referred to our final decree by a special law. This relieves the court from the difficulty in which they found themselves in giving a construction to the treaty in the case of Foster and

[United States v. Arredondo and others.]

Elam v. Nelson. A treaty is in its nature a contract between "two nations, not a legislative act. It does not generally effect of itself the object to be accomplished, especially so far as its object is infra territorial, but is carried into effect by the sovereign powers of the parties to the inst ument; when either of the parties *engages* to perform a particular act, the treaty addresses itself to the *political* not the *judicial* department, and the *legislature must execute the contract before it can become a rule for the court.*"—2 Peters, 314. But the court are, in this case, authorised to consider and construe the treaty, not as a contract between two nations, the stipulations of which must be executed by an act of congress before it can become a rule for our decision, not as *the basis* and *only* foundation of the title of the claimants; but as a *rule* to which we must have a *due regard,* in deciding whether the claimants have made out a title to the lands in controversy, —a rule by which we are neither directed by the law or bound to make our decree upon, any more than on the laws of nations, of congress, or of Spain. The act of 1824 and 1828 authorise and require us to decide on the pending title on all the evidence and laws before us. Congress have disclaimed its decision as a political question for the legislative department to decide, and enjoined it on us one as purely judicial. Taking, then, the treaty as a legislative act, an item of evidence, or a rule of decision, relied on by one or both parties to this suit, we consider the second article as ceding to the United States only what of the territories belonged to Spain— that no land which had been severed from the royal domain by antecedent grants, which were valid by the laws of Spain, and created any right of property to the thing granted in the grantees; passed to the United States—such lands were not liable to subsequent appropriation by a subsequent grant. Considering the treaty as a legislative act, and applying to it the same rules, " the proposition is believed to be perfectly correct, that the act of 1783, of N. C. which opened the land office, must be construed as offering for sale those lands only which were then liable to appropriation, not those which had before been individually appropriated,"—2 Wheat. 203. So must the treaty be construed—and if a question arises what lands were ceded, the answer is found in the second article—

"vacant lands," not those which, in the language of this court, had been individually appropriated, and were not the subjects of a hostile and adversary grant. The renunciation in the third article, by both parties, was only of their respective rights, claims and pretensions to the territory renounced: neither government had any rights to renounce over the lands to which a title had been conveyed to their citizens or subjects respectively. The United States do not come into court claiming this cession and renunciation as vesting them with the whole territory in full dominion, in their sovereign capacity, with liberty to confirm previous appropriations of parts of it or not, at their pleasure; but require us to finally decide between them and the claimants as grantees from the same grantor; which grant carries the title to the land. Thus deciding between the parties on these articles of the treaty, and in conformity to the laws, rules, and principles before established, we should be of opinion that the land embraced in the grant was no longer a part of the royal domain at the date of the treaty, but private property—land not vacant, but appropriated by a prior valid deed. The eighth article was evidently intended for the benefit of those who held grants and were considered as proprietors of land in Florida—to give it a construction which would narrow and limit rights thus intended to be secured would deprive them of the benefit of the fair construction of the second and third articles of the treaty and leave them in a worse situation than if the eighth had been omitted altogether. To adopt one so severe and unjust would require words and an evident intent clearly expressed—making it imperative on our judgment to divest rights already vested.

The original treaty has been examined in the department of state—it is executed as an original, and headed " original" in both languages—it cannot have escaped our attention that it relates to the territory ceded, the boundaries between those of the two governments, the mutual renunciations, and the rights of the inhabitants of the ceded territories. There is an obvious reason for its being in Spanish as well as in English—the king had a direct interest, so far as affected his own dominions adjoining the United States, and a laudable desire to protect the inhabitants of the ceded provinces in all their rights and property. His honour was concerned most deeply in not do-

[*United States v. Arredondo and others.*]

ing an act which should deprive his subjects of what he had granted to them; by making a cession of the territory to a powerful nation—not content with ceding and renouncing only what belonged to himself, he was desirous of expressing his intention of preserving his faith, by an article which should show it to be not to leave the confirmation of grants by lawful authority at the pleasure of the United States. Before the execution of the treaty, there was inserted a stipulation in Spanish by which the ceded territory should pass into the hands of the United States with the declared intention on the part of the king of Spain, that the grants referred to operated "in presenti" as an exception and reservation of lands granted in his name and by his authority, using words which expressed his intention, in his own language, that the grants were ratified and confirmed by both governments in the very act of cession, subject to no future contingency. This furnishes a powerful and obvious reason for inserting this article in Spanish, so that the intention would be clearly understood by words denoting it in a manner not to be mistaken whenever any doubt should arise; and whenever the treaty should be produced as evidence of the cession, or for any other purpose, there should always appear in the native language of his then or former subjects, full evidence of his declared intention to protect their rights acquired by his grants, pledging his honour and faith for their security.

His minister was not willing to trust so important a matter to a treaty only in the English language. The present situation of the holders of the grants, the state of the country, the opinion of this court in Foster v. Nelson, and the argument in this cause, show the wisdom and justice which prompted him to express the intention of the king in his own language and that of his subjects. Similar or equally good reasons may have induced the ministers of this government to have the treaty drawn in its language, and thus considering the treaty in both languages, and each as is declared at its head, "original," the one version neither controls nor is to be preferred to the other: each expresses the meaning of the contracting parties, respectively, in their own language, as in the opinion of each, expressing and declaring the intention of both. If they are mistaken, and the words used do not and are not understood after-

wards by the parties to convey the same meaning in both languages; then, both being originals and of equal authority, we must resort to some other mode than the inspection of the treaty to give it a proper construction, under the special acts of congress, which require us to decide on the validity of the grants referred to in the eighth article, by the principles and rules of justice and equity, the law of nations: the stipulations of the treaty, the acts of congress, and the laws of Spain, and on such testimony as may be admissible by the rules of evidence and principles of law. Applying, then, these tests to the eighth article, and to ascertain its legal meaning when the contracting parties understand it differently, we consider it as in its effect and legal operation, an exception and reservation of the lands so granted, from the territory ceded to the United States. If the title was confirmed presently, the king had within the bounds of the grant no right or title to convey, and the United States could receive none. If no future act of theirs was necessary to their ratification and confirmation, the legal estate, much less the beneficial interest, never passed to them. A treaty of cession is a deed of the ceded territory, the sovereign is the grantor, the act is his, so far as it relates to the cession, the treaty is his act and deed, and *all* courts must so consider it, and deeds are construed in equity by the rules of law.

A government is never presumed to grant the same land twice, 7 J. R. 8. Thus a grant, even by act of parliament, which conveys a title good against the king, takes away no right of property from any other; though it contains no saving clause, it passes no other right than that of the public, although the grant is general of the land; 8 Co. 274, b.; 1 Vent. 176; 2 J. R. 263. If land is granted by a state, its legislative power is incompetent to annul the grant and grant the land to another; such law is void, Fletcher v. Peck, 6 Cr. 87, &c. A state cannot impose a tax on land, granted with an exemption from taxation, New Jersey v. Wilson, 7 Cr. 164; nor take away a corporate franchise, Dartmouth College v. Woodward, 4 Wheat. 518. Public grants convey nothing by implication; they are construed strictly in favour of the king; Dy. 362, a; Cro. Car. 169. Though such construction must be reasonable, such as will make the true intention of the king as expressed

in his charter take effect, is for the king's honour, and stands with the rules of law; 4 Com. Dig. 428, 554; G. 12; 10 Co. 65. Grants of the strongest kind, *"ex speciali gratia, certa scientia, et mero motu,"* do not extend beyond the meaning and intent expressed in them, nor, by any strained construction, make any thing pass against the apt and proper, the common and usual signification and intendment of the words of the grant, and passes nothing but what the king owned; 10 Co. 112, b.; 4 Co. 35; Dy. 350, 1, pl. 21. If it grant a thing in the occupation of B. it only passes what B. occupied; this in the case of a common person, a fortiori in the queen's case, 4 Co. 35 b.; Hob. 171; Hard. 225. Though the grant and reference is general, yet it ought to be applied to a certain particular, as in that case to the charter to Queen Caroline—*id certum est quod certum reddi potest,* 9 Co. 30, a. 46 a. 47, b. S. P. When the king's grant refers in general terms to a certainty, it contains as express mention of it as if the certainty had been expressed in the same charter; 10 Co. 64 a. A grant by the king does not pass any thing not described or referred to, unless the grant is as fully and entirely as they came to the king, and that *ex certa scientia,* &c. Dy. 350, b.; 10 Co. 65, a.; 2 Mod. 2; 4 Com. Dig. 546, 548. Where the thing granted is described, nothing else passes, as "those lands;" Hard. 225. The grantee is restrained to the place, and shall have no lands out of it by the generality of the grant referring to it; as of land in A. in the tenure of B, the grant is void if it be not both in the place and tenure referred to. The pronoun *"illa"* refers to both necessarily, it is not satisfied till the sentence is ended, and governs it till the full stop. 2 Co. 33; S. P. 7 Mass. 8, 9; 15 J. R. 447; 6 Cr. 237; 7 Cr. 47, 48. The application of this last rule to the words *"de illas,"* in the eighth article, will settle the question whether its legal reference is to lands alone, or to "grants" of land. The general words of a king's grant shall never be so construed as to deprive him of a greater amount of revenue than he intended to grant, or to be deemed to be to his or the prejudice of the commonwealth; 1 Co. 112, 13 b. "Judges will invent reasons and means to make acts according to the just intent of the parties, and to avoid wrong and injury which by rigid rules might be wrought out of the act." Hob. 277.

The words of a grant are always construed according to the intention of the parties, as manifested in the grant by its terms or by the reasonable and necessary implication, to be deduced from the situation of the parties and of the thing granted, its nature and use; 6 Mass. 334, 5; S. & R. 110; 1 Taunton, 495, 500, 502; 7 Mass. 6; 1 B. & P. 375; 2 J. R. 321, 2; 6 J. R. 5, 10; 11 J.R. 498, 9; 3 E. 15; Cro. Car. 17, 18, 57, 58, 168, 169; Plo. 170, b. 7; E. 621; Cowper, 360, 363; 4 Yeates, 153. These are the fixed rules governing private grants, which are construed strongly against the grantor and liberally for the grantee. Yet he shall never take by general words or by construction what the grantor had before granted to another. The controlling effect which the situation of the grantor and the property alleged to be conveyed as evidence of the intention of the grantor, is in law such, that in the case of Moore v. Magrath, in 1774, Lord Mansfield declared, " I am very clear it might be plainer with the deed, but without seeing the deed it is plain enough." The words of the deed were sweeping ones: " Together with all his, the said Michael Moore's lands, tenements and hereditaments in Ireland." Yet it did not pass his paternal estate; the court was unanimous, Cowper, 9, 11; the authority of this case is unquestionable. In Shirras v. Craig, this court decided, that when there was a piece of property answering to the description in the deed, other property included in the deed, but not intended to be conveyed, did not pass, 7 Cr. 47, 48. It is useless to pursue the inquiry, whether by the common law the grant of a king can be adjudged to pass what he had conveyed to another, and whose title he intended to ratify and confirm by the very act of a grant to another, by excepting it from the generality or the thing granted, and reserving it from the operation of the new grant for the use of a prior grantee. But it is not deemed useless to show the doctrine of this court as to exceptions and reservations in public and private grants. " The insertion of this reservation in this act (a law of North Carolina), leads almost necessarily to the opinion that the lands granted to Martin and Wilson, were a part of those to which the act related, and the words of the section show that their title was acquired by this act: "By no course of just reasoning can it be inferred, from these permissions to make appropriations within bounds, not

open to entry generally, that a vested right to lands not lying within the limits to which the act relates is annulled," Rutherford v. Green, 2 Wheat. 205.    In order, therefore, to ascertain what is granted, we must first ascertain what is included in the exception; for *whatever is included in the exception, is excluded from the grant,* according to the maxim laid down in Co. Lit. 47 a. (4 Com. Dig. 289, Fait. E. 6.) *Si quis rem dat, et partem retinet, illa pars quam retinet semper cum eo est et semper fuit;* Greenleaf v. Birth, January 1832, opinion of this court by Story, Justice, the other judges concurring unanimously on this point.

It became, then, all important to ascertain what was granted by what was excepted.    The king of Spain was the grantor, the treaty was his deed, the exception was made by him, and its nature and effect depended on his intention, expressed by his words, in reference to the thing granted and the thing reserved and excepted in and by the grant.    The Spanish version was in his words and expressed his intention, and though the American version showed the intention of this government to be different, we cannot adopt it as the rule by which to decide what was granted, what excepted, and what reserved; the rules of law are too clear to be mistaken and too imperative to be disregarded by this court.    We must be governed by the clearly expressed and manifest intention of the grantor, and not the grantee in private a fortiori in public grants.    That we might not be mistaken in the intention or in the true meaning of Spanish words, two dictionaries were consulted, one of them printed in Madrid, and two translations were made of the eighth article, each by competent judges of Spanish, and both agreeing with each other, and the translation of each agreeing with the definition of the dictionaries.    "Quedan" in Spanish, correctly translated, means "shall remain"—the verb "quedan" is in French "*reste,*" Latin, "*manere*" "*remanere,*" and English, "*remain,*" in the present tense.    In the English original, the words are "shall be"—words in the future.    The difference is all important as to all Spanish grants, if the words of the treaty were that all the grants of land "shall remain confirmed," then the United States by accepting the cession, could assert no claim to these lands thus expressly excepted.    The proprietors could bring suits to recover them without any action of congress, and any question arising would

be purely a judicial one. "Shall be ratified," makes it necessary that there should be a law ratifying them or authorizing a suit to be brought, otherwise the question would be a political one, not cognizable by this court, as was decided in Foster and Elam v. Nelson.

But aside from this consideration, we find the words used in the Spanish sense as to the grants made after the 24th of January 1818, which are, by the same article in English, "*hereby declared and agreed to be null and void.*" The ratification is in Spanish and English. The Spanish words in the Spanish version are "*quedado*" and "*quedan*" in reference to the annulled grants; the English are "*have remained,*" "*do remain.*" The principles of justice and the rules of both law and equity are too obvious not to require that in deciding on the effect and legal operation of this article of the treaty by the declared and manifested intention of the king, the meaning of Spanish words should be the same in confirming as in annulling grants—a regard to the honour and justice of a great republic, alike forbid the imputation of a desire that its legislation should be so construed and its law so administered, that the same word should refer to the future as to confirming and to the present in annulling grants in the same article of the same treaty.

For these reasons and in this conviction, we consider that the grants were confirmed and annulled respectively—simultaneously with the ratification and confirmation of the treaty, and that when the territory was ceded, the United States had no right in any of the lands embraced in the confirmed grants.

As this point was urged at length by counsel on both sides, it was due to them that the court should consider it fully and express their opinion upon it clearly; argued as this case has been, upon grounds deemed by both sides vital to its merits—we could not exclude them upon our consideration. But there are other grounds, which, though not adverted to by counsel, would, in our view, have led to the same result. It is wholly immaterial to the decision of this case, whether the eighth article of the treaty is construed to be an actual present confirmation and ratification of the grants by both governments, or a stipulation of it for the future; for the laws of 1824 and 1828, require us to decide on the validity of the title of the

claimants under those grants *according to the stipulation of any treaty.*    Our decree is final, and, if in favour of the claimants, is conclusive against the title of the United States.    Under these laws the effect of the stipulation to ratify and confirm the grants is a judicial question, referred to us as such by congress; in deciding upon it by the rules prescribed, we assume no authority, we but obey the laws, as in duty bound, by decreeing according to our most deliberate and settled judgment.    Should we be called on to decide on the validity of a title acquired by any Spanish grant not embraced by these laws, we should feel bound to follow the course pursued in Foster against Nelson, in relation to the stipulation in the eighth article of the Florida treaty, " that the legislature must execute the contract before it can become a rule for this court," 2 Peters, 314.    We are thus explicit to avoid possible misapprehension.

We are also of opinion that the legal construction of the eighth article in English, would lead to the same conclusion at which we have arrived, according to the view heretofore taken of the Spanish.    The law deems every man to be in the legal seisin and possession of land to which he has a perfect and complete title; this seisin and possession is co-extensive with his right and continues till he is ousted thereof by an actual adverse possession.    This is a settled principle of the common law, recognized and adopted by this court in Green v. Litter, 8 Cranch, 229, 230; Barr v. Gratz, 4 Wheat. 213, 233; Propagation Society v. Pawlett, 4 Peters, 480, 504, 506; Clarke v. Courtney, 5 Peters, 354, 355.    And is not now to be questioned.

This gives to the words " in possession of the lands" their well settled and fixed meaning; possession does not imply occupation or residence; had it been so intended, we must presume they would have been used.    By adopting words of a known legal import, the grantors must be presumed to have used them in that sense, and to have so intended them; to depart from this rule would be to overturn established principles.

To adopt the literal English version and reject its meaning as settled at common law and by this court would make this article confine the confirmation of grants of land to cases of actual occupation and residence.    This would be to give to the

treaty a construction more limited than the acts of congress have done to place Spanish grants on a worse footing under the Florida, than they were under the Louisiana treaty, or the compact with Georgia, and to exclude from our consideration many of the same classes of cases on which special tribunals in their proceedings under the stipulations of the treaty had decided and confirmed similar grants. We are satisfied that by adopting and acting on this version, so taken literally, we should violate the intention and spirit of the laws which give us jurisdiction, and are the guides to its exercise; we cannot decide according to the principles of justice in any other way than by considering the words according to their legal acceptation too often given by this court not to be respected by it. By grants of land we do not mean the mere grant itself, but the right, title, legal possession and estate, property and ownership; legally resulting upon a grant of land to the owner. There is one other expression in the second clause of the eighth article which we deem it our duty to notice. In the English version it is " but the owners in possession of such land," &c.; there is no sentence in the Spanish version which can correspond with this, the word " proprietarios" means owners, but not " owners in possession of such land." The intention of the Spanish grantor is too apparent to be mistaken by any tribunal authorized to decide judicially on the true construction of a contract according to the meaning and intention of the contracting parties. This furnishes another powerful reason in favour of the construction we have given to the English phrase, by which their legal intendment and effect are the same.

This part of the eighth article was for the benefit of those persons who were purchasers under the faith of a public grant, evidently intended to be protected and secured in their rights by the stipulation of a treaty which ought to be construed liberally by a tribunal authorized and required to decide on the validity of these grants by the principles of justice and according to the rules of equity having a due regard to this article of the treaty. We cannot better regard it than by carrying into effect these principles and rules, by such an exposition of it as we are convinced meets the intention of the parties and effectuates the object intended to be accomplished.

We now consider the conditions on which the grants were made. According to the rules and the law by which we are directed to decide this case, there can be no doubt that they are *subsequent*, the grant is in full property in fee, an interest vested on its execution which could only be divested by the breach or non-performance of the conditions, which were, that the grantees should establish on the lands two hundred Spanish families together with the requisites pointed out, and which shall be pointed out by the superindendency; and begin the establishment within three years from the date of the grant. No time was fixed for the completion of the establishment, and no new requisites or conditions appear to have been imposed. From the evidence returned with the record we are abundantly satisfied that the establishment was commenced within the time required, (which appears to have been extended for one year beyond that limited by the grant), and in a manner which, considering the situation of that country as appears by the evidence, we must consider as a performance with that part of the condition. Great allowance must be made not only from the distracted state and prevalent confusion in the province at the time of the grant, but until the time of its occupation by the United States. Though a court of law must decide according to the legal construction of the condition and call on the party for a strict performance, yet a court of equity acting on more liberal principles will soften the rigour of law, and though the party cannot show a legal compliance with the condition, if he can do it *cy pres* they will protect and save him from a forfeiture; 4 Dall. 20.1; 2 Fonb. 217, 218, 220; 1 Vern. 224, 225; 2 Vern. 267, and note.

The condition of settling two hundred families on the land has not been complied with in fact; the question is, has it been complied with in law, or has such matter been presented to the court as dispenses with the performance and divests the grant of that condition.

It is an acknowledged rule of law that if a grant is made on a condition subsequent, and its performance becomes impossible by the act of the grantor, the grant becomes single. We are not prepared to say that the condition of settling two hundred Spanish families in an American territory has been, or is

possible; the condition was not unreasonable or unjust at the time it was imposed, its performance would probably have been deemed a very fair and adequate consideration for the grant, had Florida remained a Spanish province. But to exact its performance after its cession to the United States would be demanding the "summum jus" indeed, and enforcing a forfeiture on principles which if not forbidden by the common law, would be utterly inconsistent with its spirit. If the case required it, we might feel ourselves at all events, justified, if not compelled to declare, that the performance of this condition had become impossible by the act of the grantors; the transfer of the territory, the change of government, manners, habits, customs, laws, religion, and all the social and political relations of society and of life. The United States have not submitted this case to her highest court of equity on such grounds as these, we are not either authorised or required by the law which has devolved upon us the final consideration of this case to be guided by such rules or governed by such principles in deciding on the validity of the claimants' title. Though we should even doubt, if sitting as a court of common law and bound to adjudicate this claim by its rigid rules, the case has not been so submitted. The proceeding is in equity according to its established rules our decree must be in conformity with the principles of justice, which would in such a case as this not only forbid a decree of forfeiture but impel us to give a final decree in favour of the title conferred by the grant.

It has been objected to the validity of the grant that it exceeds the quantity authorized by the laws of the province. The view we have taken of the royal order dated in September 1817, preceding the grant, and by the authority of which it purports to have been made, renders it unnecessary to say more in relation to this objection than that, the disposition of the royal domain in Florida was within the jurisdiction of the intendant Ramirez. That he had power to make the grant, the terms and extent of which were within his discretion, of the proper exercise of which this court has neither the power or right to judge. We will, however, observe that we are well satisfied that the local authority was competent to make grants of lands of a greater quantity than that to which the

counsel of the United States have contended that they were limited; the United States have never insisted on limiting grants to such a pittance.     Their uniform legislation and the proceedings of all the tribunals who have acted under their authority during all the time which has elapsed since their acquisition of any territory within which Spanish grants have been issued show that they have never been disposed to confine them so narrowly, but the contrary.     This case does not require us to define their extent.

The question of fraud has been pressed in the argument, but we perceive nothing in the evidence which shows its existence so as to bring it home to the claimants or that it exists at all according to the definition and rules heretofore settled.

· It is objected that the lands in question are within the Indian boundary, and not subject to be granted.     Of the fact of such location there seems to be no doubt, as the centre of the grant is the Indian town of Alachua.     The title of the Indians to these lands is not a matter before us; the grant is made subject to their rights if they return to resume them, and their abandonment has been ascertained by a proceeding which the intendant in the grant calls a sentence pronounced by him in his official character, on the report of the attorney and surveyor general.     This seems to be a mode of proceeding known to the Spanish law in force in the province, in the nature of an inquest of office, as a judicial act, which vitally affecting the royal domain, come within its general superintendency, under the royal order of September.     It was conducted, so far as we can perceive, by the proper officers; the law officer of the crown to report on the laws affecting the subject, and the surveyor general as to the fact; so that on their joint report, the superior officer could decree officially, whether, from the nature of the Indian right of occupancy, it had in law and by the actual condition of the land, in fact, reverted to and become re-annexed to the royal domain by the abandonment of the occupancy.     The intendant pronounced his sentence on the report of these officers, and declared the granted lands to be a part of the royal domain, and open to a grant, reserving the Indian right of occupancy whenever it should be resumed.     The fact of abandonment was the important one to be ascertained, if voluntary, the dominion of

the crown over it was unimpaired in its plenitude; if by force the Indians had the right whenever they had the power or inclination to return.

This is a matter which we feel bound to consider a judicial one, and that we cannot look behind the final sentence of an authorised tribunal to examine into the evidence on which it was founded; but must take it as a *"res adjudicata"* by a foreign tribunal, judicially known and to be respected as such. Similar proceedings are directed by the various acts of congress; the land commissioners, or officers of the land offices, as the case may be, confirm or reject claims, and the land embraced in the rejected claims, reverts to the public fund. So it is provided by the seventh section of the act of 1824, as to claims barred by not being duly presented or prosecuted, or which shall be decreed against finally by this court. There is another answer to this objection, which deserves notice: grants of land within the Indian boundary, are not excepted in the laws referring them to judicial decision; congress made what exceptions they thought proper; as the law has not done it, we do not feel authorised to make an exception of this.

It is lastly objected, that the extension of time by the intendant in December 1820, was without authority, being subsequent to the ratification of the treaty by the king of Spain. But the ratification by the United States was in February following, and the treaty did not take effect till its ratification by both parties operated like the delivery of a deed to make it the binding act of both. That it may and does relate to its date as between the two governments, so far as respects the rights of either under it, may be undoubted; but as respects individual rights, in any way affected by it, a very different rule ought to prevail. To exact the performance of the condition of settlement of two hundred Spanish families, or any great progress in its commencement, after the date of the treaty and during the confused and uncertain state of things preceding its ratification; would be both unreasonable and unjust; and if the question was new in this court, we should have no hesitation in saying, that as to the grants of land subject to the condition of settlements, the ratification of the treaty must be taken at its date. But the question is not a new one. In 1792 the state of Pennsylvania passed a law for the sale of her va-

cant lands; the warrants issued under it contained a condition of improvement and settlement, within two years from their date, unless prevented by force of arms of the enemies of the United States, from making and continuing such settlement. The treaty of Greenville was made in August 1794, but not ratified till December 1795. The uniform decisions of the supreme court of Pennsylvania, and the solemn decision of this court in Huidekoper's Lessee against Douglass, have settled the date of the treaty to be its ratification, so far as it bears on or in any way affects the rights of parties under the land laws of Pennsylvania. The obligation to settle did not begin till the expiration of two years thereafter, and if commenced in the course of the following spring, the condition has been considered as complied with. 3 Cranch, 1, 65; 4 Dall. 199.

Being therefore of opinion that the title of the claimants is valid, according to the stipulations of the treaty of 1819, the laws of nations, of the United States, and of Spain, the judgment of the court below is affirmed. (a)

Mr Justice THOMPSON, dissenting.

Not concurring in the conclusion to which the court has come in this case, and considering the magnitude of the property involved, not only in this case but in the application of the principles which govern the decision, to other cases, and that the construction now given to the treaty is confessedly at variance with that which has been heretofore adopted, I shall briefly assign my reasons for dissenting from the opinion of the court. It is not my purpose to enter into an examination of all the questions which have been discussed at the bar. The view which I have taken of the case, does not make it necessary for me to do so.

The grant under which the petitioners in the court below set up their claim, bears date on the 22d of December 1817, and is for a tract of land in East Florida, a little short of three hundred thousand acres. It was made by Don Alexander Ramirez, intendant of the island of Cuba, and superintendent of the two Floridas. It recites that the memorial for the same was presented to the intendancy on the 15th of November, then last past, praying a gratuitous concess-

(a) An impression of this opinion was submitted to, and corrected by, Mr Justice Baldwin by the printer, before it was put to press.

[United States v. Arredondo and others.]

ion of the land, and offering to make an establishment in the territory, known by the name of Alachua, composed of two hundred families. The grant is thereupon gratuitously made, as therein expressed, in full property; and with the precise obligation, to establish there two hundred families, which must be Spanish, the establishment beginning within the term of three years, at most; without which the grant shall be considered null and void.

The validity of this claim, depends on the construction of the eighth article of the treaty between the United States and the king of Spain, bearing date the 22d of February 1819. It is contended on the part of the appellees, that under the true construction of this treaty the only questions open for inquiry are, 1st, whether the grant is genuine, and, 2dly, whether made by lawful authority. That upon the establishment of these points, the treaty, ipso facto, confirms the grant, and closes the door to all further inquiry—the date of the grant being antecedent to that of the treaty. It is admitted that this is a different interpretation of the treaty, from that which has heretofore prevailed in our own government; and the change of construction is rested upon an interpretation of the Spanish language, as used in the treaty, rejecting the English side of that instrument. The treaty when signed was in both languages; and each must be considered as the original language, and neither as a translation. It cannot be said that the English is an erroneous translation of the Spanish, any more than that the Spanish is an erroneous translation of the English. The English side of the eighth article of the treaty reads thus: "all the grants of land made before the 24th of January 1818, by his catholic majesty, or by his lawful authorities, in the said territories ceded by his majesty to the United States, *shall be ratified and confirmed to the persons in possession of the lands,* to the same extent, that the same grants would be valid if the territories had remained under the dominion of his catholic majesty. But the owners in possession of such lands, who by reason of the recent circumstances of the Spanish nation, and the revolutions in Europe, have been prevented from fulfilling all the conditions of their grants, shall complete them within the terms limited in the same, respectively, from the date of the treaty; in default of which the said grants shall be null and void. All grants made since the 24th of January 1818, when

[United States v. Arredondo and others.]

the first proposal on the part of his catholic majesty for the cession of the Floridas was made, are hereby declared to be null and void."

The material parts in which the English and Spanish are said not to agree are, 1st, where the English declares that the grants "shall be ratified and confirmed," the Spanish is "shall *remain* ratified and confirmed;" and, 2dly, where the English is, "shall be ratified and confirmed to the persons in possess on of the land," the Spanish construction is, "to the persons in possession of the *grants*;" and, 3dly, in that part of the article which extends the time for fulfilling the conditions, which according to the English, is, to the owners in possession of the "land," the Spanish construction is, "the owners in possession of the grants." It will readily be perceived that the different readings lead to very different results, and which materially affect the grant in question. If titles are confirmed only to persons in possession of the land at the date of the treaty, the grant in question does not come within the saving; for there is no pretence that Arredondo, or any person claiming under him, was at the date of the treaty in possession of the land, or had done any thing towards fulfilling the conditions upon which the grant was made to depend, and without which it is declared to be null and void. If the construction of the Spanish side of the treaty, as now contended, is to be adopted, and all grants before the 24th of January 1818, are confirmed by the treaty, *proprio vigore*,—the declaration that they shall be confirmed to the same extent that the same grants would be valid, if the territories had remained under the dominion of his catholic majesty, are entirely nugatory, and must be rejected: for we have no right to enter into the inquiry how far they would be valid under the Spanish government. Such was most manifestly not the intention of the contracting parties; but that the United States should be substituted in the place of Spain, and should carry into execution in good faith the contracts made under the Spanish government for the disposition of the lands, and which the Spanish government was bound *ex debito justitiæ* to carry into execution. The treaty must be considered as made in reference to an established system relative to the disposition of the land in the territories ceded—and that all grants would be open to examination,

whether valid or not, according to the rules and regulations established by such system. It seems to be admitted, that if the English side of the treaty is to govern, the grant in question would not come within the saving of the eighth article, unless the date of the treaty is to be considered as of the time it was finally ratified on the 19th of February 1821. Before which time it is contended, the establishment was commenced according to the conditions of the grant. This question will be noticed hereafter.

I do not profess to understand the Spanish language, and shall therefore not undertake to say whether the criticisms are well founded or not. But it must strike any one as a little extraordinary, not only that the negotiators of the treaty should have sanctioned such a material discrepancy; but that congress should have been legislating for ten years past upon the English side of the treaty, different boards of commissioners sitting and trying the titles under such constructions, and that this court should have fallen into the same error, and the mistake not discovered till now.

But admitting this discrepancy, as now contended for, exists between the English and Spanish side of the treaty, the question arises, which must we adopt? I know of no rule that requires a court of justice to reject the English, and adopt the Spanish. If congress in their liberality should think proper to do this, the power could not be disputed, and so far as it extended to the protection of actual *bona fide* settlers upon the land, the power, in my judgment, would be wisely and discreetly exercised. But it does not seem to me that a court of justice can be called upon, as a matter of courtesy, to yield this to a foreign power, in the construction of a treaty; and no rules of law applicable to the construction of contracts, will, in my judgment, justify it. It certainly will not be pretended that the royal rule of construction applies to this case. That where a grant is made by the king, it is to be taken most beneficially for the king and against the grantee. It is, I think, not claiming too much to consider it a contract between equals; and the rule would be more applicable which requires in such case, that the grant should be construed most strongly against the grantor.

It is certainly true, as a general rule, that all written instruments are to be construed by themselves, without resorting

to evidence *dehors* the instrument, to ascertain the intention of the parties, except where there is a latent ambiguity, which is not the case here. But that principle cannot 'with propriety be applied to the present case; the difficulty does not arise from any obscurity either in the English or in the Spanish side of the treaty, if considered separately; but from a discrepancy, when compared together; and, in my judgment, presents a proper case for an inquiry into the intention and understanding of the parties who negotiated the treaties.

"Every treaty," says Vattel, "must be interpreted as the parties understood it when the act was proposed and accepted." The lawful interpretation of the contract ought to tend only to the discovery of the thoughts of the author or authors of the contract; as soon as we meet with any obscurity, we should seek for what was probably in the thoughts of those who drew it up, and interpret it accordingly. This is the general rule of all interpretation. That all miserable subtleties and quibbles about words are overthrown by this unerring rule. (Vattel, see 262, p. 228, 230.)

Such understanding, in the present case, is to be collected from written evidence which will speak for itself, and not from parole declarations, which might be misunderstood or misrecollected; and if we resort to such written evidence, no doubt, it appears to me, can remain on the construction of the treaty, that it was not the understanding, either of Mr Adams or Don Onis, that all grants of land made before the 24th of January 1818, by his catholic majesty or his lawful authorities, should be confirmed by the mere force and operation of the treaty.

It is said the treaty does not purport to transfer private property; that all such property is excepted under the second article. This proposition cannot be true in the broad extent to which it has been laid down. It may not transfer private property, but it annuls private property, if every grant, of whatever description, is to be considered private property. For upon this construction, there would be a direct repugnancy between the second and the eighth articles; the latter declares that all grants made since the 24th of January 1818, shall be null and void. But the king of Spain did not consider a mere gratuitous grant, upon conditions which had in no manner whatever been fulfilled, as private property. This must have

been the ground upon which he annulled the grants to Alagon, Punon Rostro, and Vargas. So it was understood by Don Onis, as will be shown hereafter by his correspondence. And the same power was assumed over like grants in other cases, where no private right became vested by taking possession, or doing some act towards fulfilling the condition of the grants; and where that has been done, the right is secured to the person in possession, according to the provisions of the eighth article. But let us look at the correspondence between Mr Adams and Don Onis which lead to this eighth article.

The material point of difference between the negotiators in framing this article was, whether it should absolutely confirm all grants made prior to the 24th of January 1818, or only sub modo, so as to enure to the benefit of actual bona fide settlers on the land at the time the treaty wa made; and the article resulted in the form in which it now stands.

The article states that the proposition to cede the territory originated on the part of Spain on the 24th of January 1818; or that is assumed as the date, though doubtless there must have been some previous communications on the subject, either here or by our minister in Spain; for Mr Erving, by his letter of the 10th of February 1818, wrote to Mr Adams, that the king of Spain had lately made large grants of land in East Florida to several of his favourites; and that he had been credibly informed, that by a sweeping grant to the duke of Alagon, he had within a few days past given away the remainder. 1st vol. State Papers, 13.

Our government was therefore apprised of what was probably going on with respect to grants in Florida, and must be presumed to have intended to guard against them. On the 24th of October 1818, Don Onis sent to Mr Adams a proposition to cede the Floridas, with the following clause: "The donations or sales of lands made by the government of his majesty, or by legal authorities, until this time, are nevertheless to be recognized as valid." On the 31st of October Mr Adams answered, declining his proposal, and requiring all the grants lately alleged to have been made by Spain should be cancelled, and proposed to carry back the time to all grants made after the year 1802. This Don Onis declined, but offered to annul all grants made after the 24th January 1818; saying, that the

grants had been made with a view to promote population, cultivation and industry, and not with that of alienating them; and that they should be declared null and void in consideration of the grantees not having complied with the essential conditions of the cession. 1st vol. State Papers, 25, 26.

Again, on the 9th February 1819, Don Onis, in his project of a treaty sent to Mr Adams, reiterates the same provision, that all grants shall be confirmed and acknowledged as valid except those which had been issued after the 24th of January 1818, which should be null in consideration that the grantees had not complied with the conditions of the cessions. 1 S. P. 87.

In all this correspondence we find Don Onis persisting in his claim, that all grants prior to the 24th of January 1818, should be absolutely confirmed; and assigning as the reason why those issued subsequent to that date should be annulled, because the grantees had not complied with the conditions; and we find Mr Adams continually rejecting the proposition to consider the grants before that period absolutely confirmed: and yet it is now insisted that all such are confirmed by the treaty. The subsequent negotiation shows that the article, as it now stands, was put into that shape expressly for the purpose of guarding against such construction, and with the understanding, both of Don Onis and Mr Neuville, who acted in his behalf during a part of the negotiation, that the grants of land dated before as well as after the 24th of January 1818, were annulled, except those upon which settlements had been commenced, the completion of which had been prevented by the circumstances of Spain and the recent revolutions in Europe. It is unnecessary for me to state more particularly this correspondence; the result, as above stated, will be found fully supported by a reference to the correspondence in the first volume of State Papers, pp. 13, 25, 26, 34, 46, 68, 74, 75. There can be no doubt that such was the understanding of Don Onis and Mr De Neuville; and Mr Adams, in a letter to our minister in Spain, whilst the treaty was pending before the king for ratification, states that the reasons why the grants to the duke of Alagon and others were not excluded by name, were: 1, conformably to the desire of Mr Onis to save the honour of the king; and, 2, because from the despatches of Mr Erving it was supposed there were other grants of the same kind, and

made under similar circumstances.   To have named them might have left room for a presumptive inference in favour of others: the determination was to exclude them all.

That the grant to Arredondo was made under similar cir-cumstances, and liable to the same objections with those to Alagon, Punon Rostro and Vargas, is most manifest.   Appli-cations for them all were made within a few months of each other, in the latter part of the year 1817 and beginning of 1818, and no settlements made on either at the date of the treaty: and to consider the treaty as precluding all inquiry into the validity of this grant, appears to me directly in the face of the very words of the treaty, and most manifestly against the clear understanding of those by whom it was made: and such is the construction given to this article by this court in the case of Foster and Elam v. Neilson, 2 Peters, 314.

The court say the words of the article are, "that all the grants of land made before the 24th of January 1818, by his catholic majesty, &c. shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid if the territories had remained under the dominion of his catholic majesty."   Do these words act directly on the grants so as to give validity to those not otherwise valid, or do they pledge the faith of the United States to pass acts which shall ratify and confirm them?   That article does not declare that all the grants made by his catholic majesty before the 24th of January 1818, shall be valid to the same extent as if the ceded territories had remained under his dominion; and yet this is the very construction sought to be given to it in the present case.   It does not say that those grants are hereby confirmed.   Had such been its language, it would have acted directly on the subject, and would have re-pealed those acts of congress which were repugnan to it.   But its language is, that those grants shall be ratified and confirmed to the persons in possession, &c.   By whom shall they be ratified and confirmed?   This seems to be the language of con-tract; and if it is, the ratification and confirmation which are promised, must be the act of the legislature.

Until such act shall be passed, the court is not at liberty to disregard the existing laws on the subject.   Congress appears to have understood this article as it is understood by the court.

Boards of commissioners have been appointed for East and West Florida, to receive claims for lands, and on their reports titles to lands, not exceeding        acres, have been confirmed to a very large amount.

By the act of the 8th of May 1822, 7th vol. Laws U. S. 104, sec. 4 and 5, concerning claims and titles to land within the territory of Florida, persons claiming title under any patent, grant, concession, or order of survey, dated previous to the 24th day of January 1818, which were valid under the Spanish government, or by the law of nations, and which are not rejected by the treaty ceding the territory, are required to file such claim with the commissioners; and power is given to the commissioners to inquire into the justice and validity of such claims. No patent or grant is exempt from such inquiry: and if they are absolutely confirmed by the treaty, how could the justice and validity of them be subject to the examination of the commissioners?' And the same principle runs through all the laws in relation to these claims. See acts of 1828, p. 60. 7th vol. Laws U. S. 300.

It appears to me, therefore, that the plain letter of the eighth article of the treaty, the clear and manifest intention of the negotiation, the uniform understanding of congress, and the opinion of this court, all concur in the construction, that grants made prior to the 24th of January 1818 are required to be ratified and confirmed to persons in the actual possession of the lands at the date of the treaty, and to be held valid to the same extent only that they would have been binding on the king of Spain; giving to bona fide grantees in such actual possession, and having commenced settlements, but who had been prevented by the late circumstances of the Spanish nation and the revolutions in Europe from fulfilling all the conditions of their grants, time to complete them.

If, by the true construction of the treaty, the party claiming the benefit of this article must show an actual possession of the land at the date of the treaty, it becomes necessary to inquire what that date is. It was concluded and signed on the 22d of February 1819, ratified by the king of Spain on the 24th of October 1820, and by the United States on the 19th of February 1821; and the question is, which of these periods is to be taken as the date of the treaty? I think the time the treaty

was concluded and signed, must be taken as the date. The contracting parties had in view the state and condition of things at that time, and neither could in good faith ·change such con- dition so as to affect any stipulations in the treaty. Any other construction would open the door to fraud and imposition. Suppose the eighth article, instead of the 24th of January 1818, had said, all grants of land made before the date of the treaty shall be valid; would that have made valid grants issued after the treaty was signed, and before ratified by the United States? No one, it is believed, would contend for this; and if for any purpose the date as fixed by the instrument would govern, it ought in all cases. The rule should be uniform, and not open to be changed for the purpose of meeting particular cases. The date as fixed in the instrument is the only certain period: the time of ratification is altogether uncertain. Changes may take place between the two periods, materially affecting the negotiation, and the ratification may be delayed for the express purpose of acco nplishing some such object.

The true rule on this subject is laid down by Mr Justice Washington, in the case of Hylton v. Brown, 1 Wash. C. C. R. 312; that the treaty, when ratified, relates back to the time of signing. The ratification is nothing more than evidence of the authority under which the minister acted. A government is bound to perform and observe a treaty made by its minister, unless it can be made to appear that he has exceeded his authority. · But a ratification is an acknowledgement that he was authorised to make the treaty; and if so, the nation is bound from the time the treaty is made and signed: and it is worthy of notice, that in all the acts of congress ·in relation to this treaty it is referred to as of the date of 22d February 1819, the time it was signed; thereby showing the understand- ing of our own government on.the subject. If this then is to be taken as the date of the treaty, there is no pretence that at that time, or even when ratified by the king of Spain, any settlement had ·been made or possession taken of any part of this tract. It is, therefore, in my opinion, a case not coming within the saving provision in the eighth article of the treaty.

But if the time of ratification is assumed as the date of the treaty, no possession of the land had then been taken, within any reasonable construction of the treaty. William H. Hall

testifies that he, with two men, by the name of Smith and Lanman, went to Alachua, on the 7th of November 1820, and began to clear some land and erect some buildings. That he soon after went to St Augustine, where he was taken sick and remained some time. That on returning to Alachua, he found some persons there, employed by Mitchell and Arredondo, who were personally disagreeable to him, and he abandoned the project and settlement (record 189); and what became of the others does not appear—they must have abandoned also: for, William H. Simmons testifies (record 174, 176), that he was at Alachua in February 1822; saw five or six houses; Wanton was there, and he understood had been upwards of a year. That on his first visit, there was no other person established there but Mr Wanton, and some negroes. So that in February 1822, one year after the ratification of the treaty by the United States, one white man and a few negroes, who, the witness understood, had been there upwards of a year, were the only persons on the land: and this is claimed to be a possession of nearly three hundred thousand acres of land, within the meaning of a solemn treaty. This view of the case renders it unnecessary for me to enter upon the inquiry respecting the authority of the intendant Ramirez to make the grant in question, or whether the conditions contained in it have been performed, or in any way dispensed with or discharged.

Upon the whole, I am of opinion that the judgment of the court ought to be reversed.


This cause came on to be heard on the transcript of the record from the superior court for the eastern district of Florida, and was argued by counsel. On consideration whereof, this Court is of opinion that there is no error in so much of the said decree as determines that the claim is valid and ought to be confirmed; and this Court doth affirm so much thereof, and doth decree that the title of the claimants is valid according to the stipulations of the treaty between the United States and. Spain, dated the 22d day of February, Anno Domini 1819, the laws of the United States in relation thereto, the laws of nations, and of Spain. And this Court pro-

ceeding to render such decree as the said superior court ought to have done, doth finally order, determine and decree, that so much of said decree as directs the land embraced in the grant of Don Alexandro Ramirez, the intendant of Cuba, to Don Fernando de la Maza Arredondo y Hijo, dated the 22d day of December, Anno Domini 1817, to be laid off "in a square tract, containing two hundred and eighty-nine thousand six hundred and forty-five and five-sevenths acres of English measurement, the centre thereof being the known *spot*, monument or marked tree, at or near the house at present the dwelling of Edward M Wanton; said *spot*, monument or marked tree, to be ascertained by the surveyor, who under the law shall survey the said tract," be and the same is hereby reversed and annulled. And this Court doth further and finally order, adjudge and decree, that the said land be laid off in a square form, containing two hundred and eighty-nine thousand six hundred and forty-five and five-sevenths acres, English measure, the centre whereof to be a place known as Alachua, inhabited in other times by a tribe of Seminole Indians. And the centre of said place, known as Alachua, to be considered as the centre of the grant.